LITTON SYSTEMS, INC., Litton Business Telephone Systems, Inc., Litton Business Systems, Inc., and Litton Industries Credit Corporation, Plaintiffs-Appellees-Cross Appellants,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Western Electric Company, Inc., Bell Telephone Laboratories, Inc., New York Telephone Company, Inc., New Jersey Bell Telephone Company, Southern Bell Telephone and Telegraph Company, The Ohio Bell Telephone Company, Southwestern Bell Telephone Company, The Pacific Telephone and Telegraph Company, and Pacific Northwest Bell Telephone Company, Defendants-Appellants-Cross Appellees.

LITTON SYSTEMS, INC.,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, Defendant-Appellee.

Nos. 1323–26, 1344, Dockets 81–7598, 7766, 7776, 7778 and 7856.

United States Court of Appeals, Second Circuit.

Argued June 14, 1982.

Decided Feb. 3, 1983.

See also 487 F.Supp. 942; 90 F.R.D. 410 and 91 F.R.D. 574.

Howard J. Trienens, New York City (Jim G. Kilpatric, William J. Jones, David J. Ritchie, New York City, Leonard Joseph, Harvey Kurzweil, Joseph Angland, Fred R. Biesecker, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Frank C. Cheston, Henry T. Brendzel, New York City, of counsel), for defendants-appellants-cross appellees.

William Simon, Howrey & Simon, Washington, D.C. (Theodore F. Craver, Larry L. Yetter, Litton Industries, Inc., Beverly Hills, Cal., Peter E. Fleming, Jr., Curtis, Mallet-Prevost, Colt & Mosle, New York City, John Bodner, Jr., Francis A. O'Brien, John W. Nields, Jr., Ralph Gordon, Albert O. Cornelison, Jr., Kevin P. McEnery, Lewis M. Barr, Lisa A. Gok, Howrey & Simon, Washington, D.C.), for plaintiffs-appellees-cross appellants.

Before OAKES, MESKILL and KEARSE, Circuit Judges.

OAKES, Circuit Judge:

This appeal is taken from jury awards exceeding ninety million dollars before trebling entered by the United States District Court for the Southern District of New York, William C. Conner, Judge, in an antitrust action brought by Litton Systems, Inc. and some of its subsidiaries (Litton) against the American Telephone and Telegraph Company and some of its subsidiaries (AT & T). The awards were based on special jury findings that AT & T used its telephone monopoly illegally to monopolize the telephone terminal equipment market, thereby excluding Litton as a competitor, and imposing costs on Litton as a customer, of the AT & T system. The jury found that this was accomplished principally through opposing the adoption of certification standards and the imposition of tariffs filed with but not approved by the Federal Communications Commission (FCC). The tariffs required telephone customers to connect equipment purchased from AT & T's competitors to the telephone system only through the use of a device designed by AT & T.

This device—called an "interface device" by Litton and a "protective connecting arrangement" (PCA) by AT & T—was used in lieu of a system of "certification standards." These standards would have regulated, as they indeed now do regulate, the kind of equipment that can be connected with the AT & T system to ensure interconnection compatibility. Under the AT & T tariff, however, Litton had to pay for the privilege, so to speak, of connecting to the system with a "black-box" of AT & T's devising. The tariff was eventually rejected by the FCC in favor of certification standards, and Litton's principal argument before the jury and to the district court was that AT & T's bad faith opposition to certification standards drove Litton out of the telephone terminal equipment market in the interim period between the filing and the ultimate rejection of the tariff. While our recounting of the facts will disclose many other complexities, pro and con, of Litton's case, certainly a crucial factor is

the FCC's ultimate finding that the interface device was not needed to protect the AT & T network from harm. Various network users had long purchased equipment from AT & T's competitors, using it without an interface with "no demonstration of . . . harm" to the AT & T network. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS),* 56 F.C.C.2d 593, 598 (1975). The gist of Litton's case and the jury's findings is that the interface device was unnecessary and uneconomical and that AT & T at all times knew this was so, and that despite clear prior indications from the FCC that the tariff would be set aside as unreasonable and destructive of competition, AT & T nevertheless proposed and fought to maintain the tariff—all in bad faith in order to exclude competition in the terminal equipment market.

AT & T raises a score of issues on appeal. In addition to disputing the evidence underlying the jury's verdict, AT & T argues that its opposition to certification standards was privileged under the First Amendment by virtue of the *Noerr-Pennington* doctrine because it merely advocated a position before a government agency. AT & T also claims that the district court erred in its evidentiary rulings, instructions to the jury, and handling of special interrogatories, and that the jury's damage award was not supported by substantial evidence and was inconsistent with certain jury findings in AT & T's favor. The jury verdict for Litton as an AT & T customer is attacked as both unsupported by the evidence and improper under the "filed tariff" doctrine of *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) and the 'target area' standing doctrine, *see Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Finally, AT & T argues that Litton's misconduct during discovery, which resulted in the denial of attorneys' fees to Litton, warranted outright dismissal of the case. Litton appeals the denial of attorneys' fees and con-

ditionally cross-appeals on the basis that the district court's instructions to the jury prevented it from recovering its full measure of damages.

Bearing in mind that in reviewing the jury's verdict the evidence must be viewed in the light most favorable to Litton, we affirm, holding the *Noerr-Pennington* doctrine inapplicable to Litton's suit as a competitor. We have considered all the parties' contentions and have found none requiring reversal. We find that the evidence was sufficient, both in terms of its weight and from the standpoint of causation, to support the damage award and that the district court's instructions to the jury and evidentiary rulings were free from prejudicial error. We also uphold the verdict for Litton *qua* customer—no small sum, albeit almost wholly insignificant relative to the principal verdict. Although we are not without doubt, perhaps because the amounts involved are so large, we uphold the district court's imposition of discovery sanctions under Federal Rule of Civil Procedure 37 and therefore deny Litton's unconditional cross-appeal. Our disposition of the case renders consideration of Litton's conditional cross-appeal unnecessary. In affirming, we take due note that this case was a model of judicial technique for handling a serious, complex, and difficult jury trial. Irrespective of what we might say regarding certain of the rulings below that we think were questionable or debatable, if not reversible error, we commend the district court's handling of the case.

## I. BACKGROUND

### A. Early Restrictions on Interconnection

Prior to 1956, AT & T had an absolute monopoly over long distance telephone service and local telephone service in areas accounting for over eighty percent of this country's telephones. Independent telephone companies, familiar to many rural users, interconnected with AT & T's long distance network and provided local telephone service in those areas not serviced by AT & T. The AT & T "telephone network" comprised local central office switching sys-

tems as well as the wires and cables linking them with the businesses and homes of customers. This monopoly, administered under the aegis of the FCC, was recognized as perfectly lawful and proper.

But AT & T had another monopoly—not similarly sanctioned—over the sale and lease of individual telephone sets and business telephone systems. Broadly speaking, a business telephone system can be classified into one of two general categories. The first, a Key System, allows a single telephone set to connect several others through the use of buttons on the telephone. Key Systems are used primarily by small offices. The second category, a PBX System, employs a central console or switching mechanism to allow interconnection of up to several thousand telephones. Key Systems and PBXs—stipulated as the relevant product market in this case—are referred to in the industry as "telephone terminal equipment." AT & T's monopoly over such equipment (including residential telephones) was preserved after the expiration of Alexander Graham Bell's original patents by the simple expedient of prohibiting the attachment of non-AT & T equipment to the AT & T system. AT & T enforced this policy by cutting off service to customers who attached non-AT & T equipment.[1] This practice was approved first by state regulatory agencies and later by the FCC after it assumed regulatory responsi-

bility for telecommunications under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* Because telephone terminal equipment sends electrical signals into the network, this policy was at that time considered necessary to ensure the safe and effective operation of the nationwide telephone network.[2]

After World War II, however, various users sought to connect devices that AT & T had always considered "foreign attachments" to the telephone network. Efforts to challenge AT & T's absolute prohibition against interconnection of non-AT & T equipment met with some limited success as early as 1947 when, in *Use of Recording Devices,* 11 F.C.C. 1033 (1947), the FCC approved the use of machines to record telephone conversations because such use was not "detrimental to the quality of telephone service." *Id.* at 1048. At the same time, the Commission ruled that interconnection must be made through "[a]dequate connecting arrangements," *id.* at 1048–49, but the responsibility for installing and maintaining connecting arrangements was vested in AT & T. The FCC's concern for the network's integrity was manifested in perhaps its most extreme form in *Hush-A-Phone Corp.,* 20 F.C.C. 391 (1955), where it prohibited the use of a mouthpiece shield designed to enhance user privacy because, although the shield did not harm the net-

---

1. Western Electric, an AT & T subsidiary, manufactures telephone terminal equipment sold by AT & T.

2. The AT & T brief describes the *potential* harms to the telephone network from "unbridled terminal equipment" as follows:

    Improper voltages generated or transmitted by customer-provided terminal equipment can cause potentially hazardous electric shock to telephone company customers and employees. Longitudinal imbalance usually results from improper grounding of the telephone lines and can cause a user to hear increased noise or another voice (*i.e.,* crosstalk) on the telephone line. Excessive signal power also causes noise and crosstalk. Faulty network control signaling can cause numerous problems, including wrong numbers, false busy signals, and incorrect billing.... Although a minor problem might be acceptable to a particular customer, the com-

bined effect of many such problems could impair telephone service for other customers. Brief at 11 n. 9.

It is to be noted, however, that no proof of *actual* harm to the telephone network from interconnection with competitors' terminal equipment was ever adduced before the FCC, *see Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS),* 56 F.C.C.2d 593, 596, 598 (1975) (First Report & Order), or in this case. The FCC certification standards as set forth in the order cited above, and as subsequently amended, are nevertheless designed to prevent the occurrence of the four basic potential harms— hazardous voltages, excessive signal power levels, excessive longitudinal imbalance, and improper network control signalling. *Id.* at 601– 11.

work,[3] it could cause garbling of conversation. The Commission's ruling was set aside and remanded by the unanimous decision in *Hush-A-Phone Corp. v. United States,* 238 F.2d 266, 269 (D.C.Cir.1956),[4] which found the ruling "neither just nor reasonable." In characterizing the ruling as an "unwarranted interference with the telephone subscriber's right reasonably to use his telephone in ways which are privately beneficial without being publicly detrimental," *id.,* the *Hush-A-Phone* court suggested that actual harm to the telephone network was to be the principle governing the validity of interconnection prohibitions.

On remand, the FCC adhered to this principle by ordering AT & T to modify its tariffs to eliminate restrictions against the use of the Hush-A-Phone device and "any other device which does not injure [AT & T's] employees, facilities, the public in its use of [AT & T's] services, or impair the operation of the telephone system." *Hush-A-Phone Corp. v. American Telephone &*

*Telegraph Co.,* 22 F.C.C. 112, 114 (1957). The ruling thus implicitly acknowledged that the AT & T network could be harmed by some forms of interconnection. *See* notes 2 & 3, *supra.* At the same time, the Commission's reference to "any other device" made it clear that the scope of the ruling extended beyond use of the Hush-A-Phone device. Nevertheless, AT & T cast its revised tariff so as to prohibit interconnection of customer-provided telephone systems.[5]

At about the same time the *Hush-A-Phone* controversy was wending its way through the Commission and the courts, a Texas inventor by the name of Thomas F. Carter was inventing a mobile radio device that allowed its users to conduct two-way conversations with persons using ordinary, stationary telephones. The "Carterfone" used inductive and acoustic principles to connect the mobile user with a telephone "base station" that completed the link to the telephone network.[6] Carter began mar-

---

**3.** This depends on how "harm" is defined; AT & T has always advanced the idea that anything causing a user to hear increased noise or another voice (crosstalk) is harmful and that longitudinal imbalance and excessive signal power do just that. *See* note 2 *supra.*

**4.** The court stated:

> To say that a telephone subscriber may produce the result in question by cupping his hand and speaking into it, but may not do so by using a device which leaves his hand free to write or do whatever else he wishes, is neither just nor reasonable.
> 238 F.2d at 269.

**5.** Tariff FCC No. 132 provided in part:

> B. GENERAL REGULATIONS
> 7. *Unauthorized Attachments or Connections.*—No equipment, apparatus, circuit or device not furnished by the telephone company shall be attached to or connected with the facilities furnished by the telephone company, whether physically, by induction or otherwise [except as provided in this tariff.] In case any such unauthorized attachment or connection is made, the telephone company shall have the right to remove or disconnect the same; or to suspend the service during the continuance of said attachment or connection; or to terminate the service.
> 24. *Miscellaneous Devices Provided by the Customer.*—The provisions of paragraph 7 preceding shall not be construed or applied to bar a customer from using devices which

serve his convenience in his use of the facilities of the telephone company in the service for which they are furnished under this tariff, provided any such device so used would not endanger the safety of telephone company employees or the public; damage, require change in or alteration of, or involve direct electrical connection to, the equipment or other facilities of the telephone company; or interfere with the proper functioning of such equipment or facilities, or impair the operation of the telephone system or otherwise injure the public in its use of the telephone company's services. [Except as otherwise provided in this tariff,] nothing herein shall be construed to permit the use of [a recording device] or of a device to interconnect any line or channel of the telephone company with any other communications line or channel of the company or of any other person. *Quoted in Use of the Carterphone Device,* 13 F.C.C.2d at 437 (brackets in original; footnotes omitted).

**6.** The Carterfone transmitted to a two-way radio at the base station serving the mobile radio system. To connect a telephone user to the mobile radio user, the base station's telephone handset was placed on a cradle in the Carterfone which automatically switched the radio to the transmitting mode when the mobile user spoke, and returned it to the receiving mode when he stopped—all this without any direct electrical connection to the telephone network.

keting his device in 1959, and within a few years he had sold several thousand units in the United States and throughout the world. The AT & T tariff filed in response to the *Hush-A-Phone* decision was consistently interpreted as prohibiting the use of the Carterfone. *See Use of the Carterphone Device in Message Toll Telephone Service,* 13 F.C.C.2d 430, 438 (1967). Carter challenged the tariff in 1967, and the FCC hearing examiner found that with the exception of a single trivial incident, *id.* at 436, the Carterfone performed "satisfactorily without causing technical problems detectable by the user." *Id.* at 433. Because the Carterfone had no adverse effect on the telephone network, the examiner ruled that its use fell within the rationale of *Hush-A-Phone Corp. v. United States,* 238 F.2d 266 (D.C.Cir.1956), and that it was "unjust and unreasonable to continue to prohibit use of the Carterphone for the purpose of interconnection after its beneficial and harmless nature has been demonstrated." 13 F.C.C.2d at 439.

The Commission decision following the hearing held that the tariff was "unreasonable and unduly discriminatory." *Use of the Carterfone Device in Message Toll Telephone Service,* 13 F.C.C.2d 420, 423 (1968). In contrast to the hearing examiner's conclusion that "a general prohibition against the use of interconnection devices is [not] unjust or unwise," *Carterphone,* 13 F.C.C.2d at 440, the Commission found the fact

> [t]hat the telephone companies may not have known prior to the proceedings herein that the Carterfone was in fact harmless is irrelevant, since they barred its use without regard to its effect upon the telephone system. Furthermore, the tariff was the carrier's own. It was not prescribed by the Commission.

13 F.C.C.2d at 425. The Commission further underscored its rejection of a blanket prohibition against interconnection when it noted that "[n]o one entity need provide all interconnection equipment for our telephone system any more than a single source is needed to supply the parts for a space probe." *Id.* at 424. It then invited the submission of "new tariffs which will pro-

tect the telephone system against harmful devices" and specifically stated that "the carriers . . . may specify technical standards if they wish." *Id.* at 426.

AT & T immediately sought reconsideration of the Commission's decision. In its order denying reconsideration, the Commission in a very real sense cemented its previous decision as follows:

> We held that the Carterfone filled a need, that its use did not adversely affect the telephone system, that its use was nevertheless precluded by the tariff, and that the tariff was unlawful, and had been in the past, because it prohibited the use of the Carterfone and other interconnecting devices without regard to actual harm caused to the telephone system. We did not prescribe the terms of a new tariff, but left that to the initiative of the telephone companies, pointing out that they were in no wise precluded from adopting reasonable standards to prevent harmful interconnection. Basic to our holding was a rejection of A.T. & T.'s position that because A.T. & T. cannot control the interconnected private system, interconnection is by definition a degradation of the message toll telephone system without regard to the quality of the interconnecting device or of the interconnected mobile radio system, i.e., without regard to actual harmful effects. We viewed this position[2] and the rule embodying it as unreasonable. . . .
>
> The primary contention upon reconsideration is that our decision permits the use of a myriad of customer-provided devices for interconnection without adequate exploration of the technical and economic problems. This record convinces us that there can be inter-connection without harmful technical effects. . . .

*Use of the Carterfone Device in Message Toll Telephone Service v. American Telephone & Telegraph Co.,* 14 F.C.C.2d 571, 572 (1968).

> We found no substantial factors outweighing the necessity of eliminating the arbitrary tariff. Standards to prevent

the introduction of harmful inputs can be devised, and enforcing them would be no more difficult than enforcing the present absolute prohibition. Furthermore, notification to the carrier of the installation of a connecting device, which would be a reasonable requirement, would greatly relieve any problems of discovering the source of any harmful interconnection. The record also showed that terminal devices may be used under a standard making actual harm a factor, and the distinction between terminal devices and interconnection appears to be solely one of function unrelated to inherent propensity for injurious effects.

*Id.* at n. 2 (citations omitted).

Significantly, the Commission also noted the broad sweep of its decision:

We also reject the related claim that the decision goes beyond the issues. To say, as some of the parties do, that the hearing related solely to the Carterfone and not to the validity of the tariff's broad prohibition would make the hearing essentially meaningless. The issues plainly included consideration of the basic validity of the tariff if it was the total prohibitory effect of the tariff which rendered its application to the Carterfone unreasonable. As we pointed out in our June decision, such a fault in a tariff can only be remedied by its revision. It should be noted in this connection that it was well understood that this was an "interconnection" case, and A.T. & T. and General both argued on a broad base the need for a general prohibition against all interconnection not arranged by them.

*Id.* at 573. (footnotes and citations omitted)

We quote from the Memorandum Opinion and Order denying the petition for reconsideration at length for two reasons. First, a redacted version was submitted to the jury, a matter disputed by AT & T and considered by us, *infra.* Second, we believe that the clarity of the Commission's language was such that from AT & T's perspective it had to be clear as a bell, so to speak, that at least as of the 1968 *Carter-*

*fone* decision, if not before, it was unreasonable, unjust, and discriminatory to prohibit interconnection of terminal equipment without respect to any harm such devices might cause. The ruling by its very terms "require[d] tariffs reasonably addressed to the asserted problems." 14 F.C.C.2d at 573. It was therefore incumbent upon AT & T to devise tariffs that would permit attachment of non-harmful devices.

## B. *The Interface Tariffs*

We suspect that the parties would disagree little with what we have said about the state of affairs up until the time of the *Carterfone* decision; at least they would agree on the facts, if not our interpretation of them. But what happened after *Carterfone* is hotly debated. Two quite different cases were presented to the jury and argued to us. The telephone company's scenario runs somewhat as follows.

### 1. *The AT & T Version*

The *Carterfone* decision was to become effective on November 1, 1968, whereupon—intolerably to AT & T—there would be no tariff provisions at all to limit equipment interconnection or specify interconnection standards. AT & T thus faced the prospect of proposing interconnection standards on very short notice with no FCC guidance and novel problems of "real" risks. *See* note 2 *supra.* In 1967, AT & T had formed a Tariff Review Group—perhaps in anticipation of the *Carterfone* ruling—to review possible tariff modifications. Although the Review Group thought performance or certification standards were feasible, this approach was viewed as posing weighty problems of a non-technical nature. Specifically, we are told, the Review Group feared that promulgation and enforcement of such standards by AT & T itself would raise serious antitrust questions. At the same time, the Review Group thought that improperly installed or maintained "good" equipment threatened the system's integrity as much as "bad" equipment, and therefore concluded that a substantial degree of protection could be effected by requiring interface hardware—the "protective con-

necting arrangement" or PCA.[7] AT & T ultimately followed the Review Group's recommendation and adopted the PCA rather than the certification standards approach. Thus, in late October of 1968, AT & T filed a tariff requiring the use of a PCA to interconnect terminal equipment. AT & T was to provide, install, and maintain the PCA at the customer's expense as fixed by the filed tariff.

The filing of the tariff sparked a spirited response, with twenty-nine parties filing responsive pleadings and comments. Opponents of the tariff argued that the PCA approach was a flawed response to *Carterfone* because it failed to specify interconnection standards, barred the use of customer-provided telephones for network control signalling, and discriminated generally in AT & T's favor. In late December of 1968, the Commission permitted the proposed tariffs to take effect, stating in *American Telephone & Telegraph Co. "Foreign Attachment" Tariff Revisions,* 15 F.C. C.2d 605, 609–10 (1968), that the decision in *"Carterfone* does not hold that a customer may substitute his own equipment or facilities (whether it be telephone instruments, loops, poles, or central office equipments) for that furnished by the telephone company." Although the Commission allowed what we will call the "interface tariffs" to take effect, it explicitly stated that its action was not to be construed as "giving any specific approval to the revised tariffs," *id.* at 610, leaving entirely open the possibility of further action. In the interim, the Commission directed all segments of the tele-

communications industry to engage in "informal engineering and technical conferences," to ascertain what "further changes are necessary, desirable, and technically feasible" in AT & T's tariff offerings. *Id.* at 610.

AT & T tells us that terminal equipment interconnection was the subject of much thought and engineering and economic consideration after the Commission decided to allow the interface tariffs to take effect. Throughout this period, however, AT & T concedes that it had no "statistically meaningful" data regarding actual harm to the network due to interconnection. AT & T Brief at 17–18 & n. 21. But, AT & T points out, a National Academy of Sciences (NAS) report commissioned by the FCC ultimately found—the report took some ten months to prepare—that network harm could be caused by a variety of factors. The report concluded that, on balance, the PCA requirement was appropriate because, although a properly enforced certification system could also protect the network from harm, the responsibility for creating and administering such a system should be shouldered by a regulatory agency rather than a private concern. In apparent response to the NAS report, the FCC formed a PBX Advisory Committee in May of 1971. The committee, composed of representatives of various interested parties including, of course, AT & T, studied the feasibility of interconnection without the PCA requirement. AT & T continued to maintain that unlimited interconnection could harm the network.[8]

7. The PCA mechanism generally combined in a single housing a "network control signalling unit," which AT & T had always claimed was necessary to protect against wrong numbers, false busy signals and incorrect billing, and a "connecting arrangement"; hence the term "protective connecting arrangement."

8. The only data AT & T produced, however, addressed effects on the network, such as crosstalk, rather than causes. Thus, in response to a request by the FCC Common Carrier Bureau for comments on certification standards proposals in October of 1973, AT & T in part submitted the following:

It is often argued that the impact on the quality of service of the interconnection of customer-provided equipment is merely potential and not real or actual. This is simply not true. In fact, our experience is clearly to the contrary. For example, current studies [the "Hunt Studies"] indicate that intercity private line serving links equipped with at least one customer-provided terminal generated trouble reports at a rate at least 50 percent higher than did serving links equipped with telephone company-provided terminals only. The studies now in progress on message telephone lines are showing like results—the trouble report rate for lines equipped with customer-provided terminals

In June of 1972, while the PBX Advisory Committee was preparing its final report, the FCC instituted rulemaking proceedings addressing the interconnection issues. The FCC took the "extraordinary" step of convening a Federal-State Joint Board (Joint Board) pursuant to 47 U.S.C. § 410(c) (1976), to determine "whether, and to what extent, there is public need ... to go beyond what we ordered in *Carterfone* and permit customers to provide, in whole or in part" network control signalling units and connecting arrangements. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS)*, 35 F.C.C.2d 539, 542 (1972). AT & T points to these developments to buttress its claim that the need for and propriety of the PCA requirement was very much an open question, emphasizing the fact that it took the FCC almost four years after *Carterfone* to address the interconnection issue.

The PBX Committee submitted its final report shortly after the Joint Board convened in 1972. The report included a model certification program based on a "barrier PBX system" that would incorporate protective circuitry obviating the need for a PCA.[9] But by this time, after "lengthy internal debate," AT & T Brief at 21, AT & T decided to oppose certification standards as an unnecessary substitute for the PCA requirement. Mr. John deButts, then AT & T Chairman, announced this position in a speech before the National Association of Regulatory Utility Commissioners (NARUC) in late September of 1973. DeButts stated in his speech that the nationwide switching network was "too valuable a resource to risk a perhaps irreversible threat to its performance that would ensue from fragmentation of responsibility for that performance." Shortly thereafter, AT & T formally opposed the certification standard approach by filing comments in the FCC rulemaking proceedings.[10] That this oppo-

is more than 25 percent higher than lines connected solely to telephone company-provided terminals. As we have previously reported to this Commission with respect to interstate voice grade private line data services, where the same minimum protection criteria apply as on the public switched telecommunications network, a sizable percentage (8.5 percent) of the customers utilizing their own data transmitting equipment were applying signal power in excess of the established network protective criteria, thereby degrading the service of other customers. The same survey showed, in the case of a particular type of connection or interface which is comparable to that encountered on public switched network services, that 18 percent of the customer-provided terminals violated the minimum network protection criteria by a substantial degree.

The comments did state, however, that:

Complete and exhaustive statistics demonstrating all the harms from uncontrolled interconnection or the total impact on the quality of service might not be obtainable, given the nature of the problem studied. Certain effects simply are not measurable. How many wrong numbers or how much crosstalk occurs from the use of customer-provided terminals can only be observed at the time of or during their occurrence. The difficulties in making such measurements are apparent. However, the data cited above are sufficiently consequential to suggest that interconnection has an adverse impact on the quality of

service. Certainly, for the reasons set forth in these comments, further loosening of interconnection policies, such as customer options embodied in the certification proposal before the Commission in this proceeding, is not in the public interest and should not be adopted.

(Footnote omitted).

9. AT & T claims that no equipment available at that time met the standards of the "barrier PBX" posited by the Advisory Committee and suggests that the concept was approved over its objection by non-AT & T chairpersons of Advisory Committee subcommittees. *See* AT & T Brief at 19–20 n. 24.

10. Elaborating some of the concerns expressed by deButts in his earlier speech, the comments stated:

The public interest ... will inevitably be impaired by the duplication of facilities and the division of responsibility that will ensue from further interconnection in an industry where compatibility of components and precise coordination of process are crucial. Interconnection has had an adverse impact on the innovative process in the telephone industry and the impact of certification would be even more detrimental.

... [A]ny program of certification would, in our view, inevitably lead to the uncontrolled connection of customer-provided equipment to the telecommunications network. The ability to allocate responsibility

sition to certification standards was undertaken in bad faith was a principal special finding of the jury on which the verdict against AT & T turned.[11]

AT & T's decision to stand behind the PCA requirement greatly upped the odds against adoption of a certification standards system. AT & T seems to agree with Litton that the deButts speech was a coda marking Litton's demise as a competitor, but denies that it opposed certification standards in bad faith and argues that Litton's failure in the terminal equipment market was inevitable by late 1973, if not earlier. According to AT & T, Litton's efforts to establish itself in this market were short-lived, poorly executed, and plagued with internal difficulties ranging from inadequate staffing to high-level corporate bribery. Litton entered the market in 1971, selling equipment made by other companies, with the hope that it could quickly develop its own products to feed the distribution and service network it created immediately after *Carterfone*. But by 1973, AT & T claims, Litton had failed to develop the caliber of product needed to compete with AT & T's evolving line of terminal equipment. This fact, coupled with the revelation that certain Litton officials had bribed their way into contracts with terminal equipment users, prompted Litton to exit the market in early 1974. AT & T's rendering of Litton's short, unhappy run in the terminal equipment race suggests that Litton lost because it sprinted early and winded quickly, and ·not because AT & T squeezed Litton into the rail with the PCA requirement.

In any event, Litton decided to withdraw from the terminal equipment market in early 1974. It was not until November of 1975, AT & T points out, that the FCC adopted regulations establishing certification standards. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS)*, 56 F.C.C.2d 593, 599–613 (1975) (First Report & Order).[12] Although the FCC declined to include PBX and Key Systems in the certification program at that time, it expressed doubt regarding the Joint Board's recommendation that this equipment presented technical problems warranting general exclusion. AT&T perforce concedes that this ruling included statutory findings that the interface tariffs were "unnecessarily restrictive" and amounted to "unjust and unreasonable discrimination." *Id.* at 598. A few months later, the FCC amended its

for network performance would perforce be destroyed.

11. The finding of predatory or anticompetitive conduct was based in part on "opposing certification in bad faith." Other such conduct initially found was "bad faith refusal to sell inside wiring at all or on a reasonable basis."

After returning its initial verdict, at which time the jury could not agree on whether the interface device tariff had been *filed* in bad faith and whether there had been "bad faith delay in making cutovers," the jury further deliberated at the court's request and found for Litton on these issues as well: hence our use of the term "a principal special finding."

12. AT & T claims that certain FCC proceedings occurring prior to the adoption of certification standard regulations had the effect of placing the FCC's imprimatur upon the PCA requirement. *See Telerent Leasing Corp.*, 45 F.C.C.2d 204 (1974), aff'd sub nom. *North Carolina Utilities Comm'n v. FCC*, 537 F.2d 787 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976); *AT & T-Mebane Home Telephone Co.*, 53 F.C.C.2d 473 (1975). It is difficult to see how either of these decisions can be read to qualify the FCC's earlier, explicit statement that it was not approving the proposed tariffs, however. *Telerent* was a declaratory judgment order expressing the Commission's disapproval of a state utility commission's proposed rule that would absolutely prohibit the interconnection of customer-provided equipment on any intrastate portion of the telephone network. The Commission held that the proposed rule was contrary to the thrust of *Carterfone* and recently instituted proceedings considering the possibility of liberalizing the post-*Carterfone* tariffs. In *Mebane* a local telephone company sought exemption from so much of the post-*Carterfone* tariffs as allowed interconnection of customer-provided equipment. Although the Commission upon its own motion granted the local carrier an opportunity to demonstrate the need for a waiver from the tariffs on the basis of economic injury, it specifically ruled that, under *Carterfone*, customers must generally be allowed to provide their own equipment.

regulations to cover PBX and Key Systems that employed protective circuitry, *Interstate and Foreign Message Toll Telephone Service,* 58 F.C.C.2d 736 (1976) (Second Report & Order). The FCC's order was affirmed on appeal. *North Carolina Utilities Commission v. FCC,* 552 F.2d 1036 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).[13] Thus, as of October 1977, after certiorari was denied by the Supreme Court, interconnection of non-AT & T equipment employing protective circuitry became a possibility. Finally, in April of 1978, the FCC issued a third order eliminating the protective circuitry requirement for properly registered and installed PBX and Key Systems. *Interstate and Foreign Message Toll Telephone Service,* 67 F.C. C.2d 1255 (1978) (Third Report & Order).

To summarize, the AT & T scenario sketches a hard-fought battle before the FCC with good faith efforts being made to protect the network. AT & T points out that it was not alone in opposing certification standards; several other interested parties—e.g., NARUC, the Joint Board, and several state utility commissions—supported the PCA approach. AT & T relies on this support, and on the fact that it took over four years from the time Litton exited the terminal equipment market for the FCC to establish certification standards, to back up its claim that it was not AT & T's "bad faith" opposition to certification standards that drove Litton from business. As might be expected, Litton's scenario plays out quite differently.

### 2. The Litton Case

In Litton's scenario, AT & T is cast as a Dorian Gray. To paraphrase Commissioner Johnson's dissent from the order staying the effect of *Carterfone* pending AT & T response, to Litton, the PCA requirement was much as if an electric utility prohibited customers from using a toaster unless it was designed, manufactured, and installed by the utility itself. Litton's case against AT & T relies heavily on the fact that AT &

T has never been able to make a case *for* the PCA requirement. Litton reminds us that AT & T has not demonstrated—before the FCC or at the trial of this case—a single instance in which the network had been harmed by a competitor's terminal equipment. Litton Brief at 8. Nevertheless, AT & T imposed the PCA requirement on all equipment sold by its competitors. Strikingly, in one case involving two Atlanta hotels using the very same brand of PBX equipment, no interface was required for the equipment that AT & T purchased from a third-party manufacturer and leased to one hotel, while an interface *was* required when the other hotel purchased its equipment directly from the third-party manufacturer. Litton suggests, as did the Fourth Circuit in *North Carolina Utilities Commission,* that the PCA requirement was a naked attempt to maintain "private lawmaking authority over independent manufacturers." 552 F.2d at 1051 (emphasis omitted). The PCA requirement stood for almost ten years, giving AT & T a chance to interfere with the normal course of every sale of terminal equipment by Litton and all of AT & T's other competitors.

Litton's argument that AT & T opposed the development of certification standards in bad faith is based on evidence that Litton believes clearly demonstrates, first, that AT & T was aware that it could not substantiate its claims of harm to the network; second, that AT & T knew that without the PCA requirement it was vulnerable to competition; and, finally, that AT & T could have developed certification standards itself immediately after *Carterfone* but opted not to in order to buy the time necessary to meet competition in the terminal equipment market.

Litton put into evidence a number of AT & T documents to support the contention that AT & T simply could not demonstrate that the PCA requirement was necessary to protect the network from harm. Specifically, Litton points to an in-house report ap-

---

**13.** The appeal covered both the First and Second Report and Order in Docket No. 19528. 56 F.C.C.2d 593 (1975); 58 F.C.C.2d 736 (1976).

The latter related to key systems and PBXs. *See* 552 F.2d at 1044.

parently prepared in 1971 by one of two AT & T representatives to the PBX Advisory Committee [14] which stated:

### A Credibility Gap Exists

[L]imited interconnection on the message network and greater interconnection on private line facilities has been in existence for a long period of time and the carriers still find it virtually impossible to cite cases of harm ... result[ing] from ... interconnect[ion] .... This inability to demonstrate cases of harm ... is causing the manufacturers ... users and regulatory bodies to ... challenge the expansive efforts which [AT & T] insists must be taken to avoid the network pollution.

Litton Brief at 29–30 (emphasis omitted). To like effect is a 1972 report submitted to AT & T management by the Director of AT & T's Management Sciences Division stating that AT & T was in its "weakest position now, because even though everyone concedes that serious breaches of our tariffs by illegal or unauthorized equipment has grown over the years, we have not been able to produce evidence of harm to anyone." *Id.* at 30. The report recommended that the interface requirement be rescinded. Litton points out that AT & T's sole evidence of potential harm to the system was derived from the Hunt Studies referred to in note 8 *supra* and which were cited by AT & T to the FCC as support for the interface requirement. Various AT & T officials conceded that the studies did not "prove anything." Nevertheless, we know that deButts maintained in his 1973 speech and in the formal filings later submitted to the FCC that there were data supporting AT & T's position on network harm from interconnection.

Litton argues that a portion of the PCA device championed by AT & T was really no more than the dial or pushbutton mechanism of a telephone—the network control signalling unit—that only duplicated the function of the same mechanism in AT & T's competitors' equipment. Moreover, AT & T knew at the outset that the PCA requirement was useless; a Task Force of the Tariff Review Group charged by AT & T management with developing "the strongest possible case to resist customer ownership of telephone equipment" had concluded in early 1968 that a PCA requirement would only "shift[ ] ... [existing] restrictions on customer-owned devices to similar restrictions through the provision of an arbitrary and redundant Telephone Company device that duplicates the customer's equipment." [15] Litton highlights the fact that the internal AT & T Task Force characterized the PCA requirement as "a redundant, artificial and economic barrier to those wishing to purchase their own

---

14. Litton claims in its brief that this report was prepared by a Mr. Byers. This appears to be the case; although the copy of the report in the appendix is unsigned, Byers' initials are typed in at the top. In any event AT & T does not dispute Litton's attribution of the report.

15. The task force report said, *inter alia:*

An attempt to design an interface, or a family of interfaces, sufficient to minimize all adverse effects of customer-provided equipment poses an economic and administrative problem.... Such an interface device would be priced at a level of at least what our existing equipment offering is now. This would, of course, result in what effectively might be considered to be an unjustified economic restriction in allowing a customer to provide his own device. And the provision of an interface does not, in itself, necessarily provide the full protection we desire ....

The report also stated: "In general, the arguments against the provision of an interface remain the same, *i.e.,* redundancy, artificial economic barrier to the customer, impracticalities of administration, doubtful acceptance of customers, etc." The task force, in making its report to the Tariff Review Group explicitly rejected the interface device requirement and specifically endorsed technical standards:

The entire concept of customer-owned equipment must be based on tariff type-approval of all terminal equipment, wiring, and apparatus, rather than on interfaces that would attempt to provide the degree of safety, quality of service, and flexibility for future services that we may wish to provide. The provision, by the Bell System, of families of interfaces for specific devices or of one interface, sophisticated enough to work with all services, would erect a redundant, artificial and economic barrier to those wishing to purchase their own equipment.

equipment." Thus, according to Litton, AT & T's own documents reveal its awareness as stated in a presentation by an AT & T executive at a Traffic Service Advisors' meeting in 1972 that "[o]nly the 'black box' ... stands as the last hardware barrier between us and the final challenge of unbridled, unlimited, no-holds-barred competition."

In Litton's account, AT & T's support for the PCA requirement was based more on a concern for its share of the terminal equipment market than it was on concern for the safety of the telephone network. Thus, AT & T kept the interface device not only to exclude competition but also to palliate its own competitive inadequacies because, despite the vaunted reputation of Bell Laboratories, AT & T had done little in the years prior to *Carterfone* to update its terminal equipment. Accordingly, notwithstanding the opinion expressed by several members of the AT & T Tariff Review Group that the PCA requirement was not responsive to *Carterfone*,[16] AT & T imposed the requirement in order to give it time to develop competitive terminal equipment. At trial, Litton put in evidence another AT & T document, the McKinsey Report, indicating that AT & T had product development and marketing problems that prevented it from meeting competition in the post-*Carterfone* era. Litton also claims that when AT & T finally did update its terminal equipment line, it did so with "Chinese copies" of successful Japanese products.

Finally, Litton maintains that AT & T could have adopted certification standards no more than a year after *Carterfone*. In support of this claim Litton again points to internal AT & T documents and memoranda suggesting that AT & T management believed the development of certification standards was inevitable by 1972, or 1973 at the latest. Litton Brief at 31–32. Litton suggests that AT & T's participation in the PBX Advisory Committee was a ruse or delaying tactic, and that the decision to

oppose certification was concealed from the FCC while AT & T appeared to cooperate with the Advisory Committee so as to avoid the appearance of bad faith.

If there is an individual villain in Litton's piece it is Mr. John deButts. DeButts took over as Chairman and CEO of AT & T about four years after *Carterfone* and stressed the fact to his management that AT & T would have only one policy with respect to certification standards: opposition. In the face of recommendations from subordinates that a certification standards approach was preferable to the PCA requirement, deButts nevertheless opposed the standards. Moreover, Litton argues that the AT & T position on certification, as dictated by deButts, was taken with full knowledge that the FCC would ultimately reject this position. Litton claims that AT & T understood that its opposition to certification exposed it to antitrust liability, citing an AT & T film simulating an antitrust trial of a suit similar to the one eventually filed by Litton and urging employees to destroy incriminating company documents. DeButts apparently remarked to AT & T lawyers shortly after his speech that he had created more opportunities for lawyers than anything "since Sherman wrote his famous law."

We thus arrive again at what both parties agree was a pivotal point for Litton in the interface tariff chronology: the deButts speech of 1973. In contrast to AT & T's claim that the PCA requirement amounted to only a little protection for the system that also served to avoid the antitrust difficulties that might flow from an AT & T enforced certification program, Litton argues that AT & T's opposition to certification—its insistence upon the PCA requirement—posed psychological and economic market barriers that drove Litton from the terminal equipment market. On the psychological side, Litton claims that the very imposition of the PCA requirement, without

---

16. *See* the minutes of Tariff Review Group meeting of July 11, 1968 noting that members Cohen, North, and Miller "feel and expressed themselves that current tariff efforts, particu-

larly with respect to interconnection, is [sic] not at all responsive to FCC Carterfone decision."

regard to its cost or inconvenience, caused customers to doubt the quality of Litton's product. Litton analogizes its burden under the interface tariffs to that which would face a foreign car manufacturer if its ability to sell in the American market were conditioned upon including a giant fire extinguisher in the car's trunk. Litton also presented evidence tending to show that AT & T engaged in slash and burn tactics calculated to make cutover from AT & T to Litton equipment as bothersome as possible for Litton and its customers alike. AT & T installers from time to time would chop off existing AT & T wiring flush with office walls in preparation for the installation of Litton equipment. AT & T made the PCA requirement onerous for customers in other ways as well: refusing to acknowledge receipt of letters arranging cutover dates, changing cutover dates, or failing to provide the necessary PCA equipment. Finally, Litton argues that AT & T's PCA devices themselves occasionally malfunctioned, thus adding actual injury to technological insult.

The PCA requirement also effected a direct economic barrier to Litton's market entry insofar as it increased the cost of installing and using Litton equipment. Although this case did not involve single line telephone sets, i.e., residential telephones, Litton is quick to point out that the PCA requirement precluded all of AT & T's competitors from entering this market because the PCA cost alone exceeded the cost of renting a telephone from AT & T.[17] Litton argues that these costs also effectively foreclosed sales of Key Systems involving five lines or less, estimated to be over 90% of the Key System market. In the market for larger Key Systems and PBX Systems, the PCA requirement was, in effect, a surcharge imposed by AT & T on customers using non-AT & T equipment sold by Litton and other competitors. When it became clear in late 1973 that AT & T would fight for the PCA requirement, Litton believed its only recourse was to cut its losses and leave the terminal equipment market because by that time AT & T had copied the successful products Litton was offering, narrowing whatever competitive advantage Litton would have had even in the absence of the PCA surcharge.

Thus, in Litton's scenario, AT & T's support for the PCA requirement—its opposition to certification standards—was no more than a rear guard effort to delay the effect of *Carterfone,* undertaken in bad faith in order to handicap competitors. The deButts speech slammed shut what was, from Litton's perspective, the "window of opportunity" created by *Carterfone.* Litton had intended to take advantage of this opportunity by following the same three-step market development program it had used successfully in other product markets.[18] First it engaged in the sale of reliable products manufactured by other concerns—this to allow Litton the opportunity to establish an immediate market presence while it readied its own products. Litton compares its 1980 gross sales of close to five billion dollars with its start in 1953 as a small electronics company and emphasizes its highly successful progress and depth of skill in the telecommunications industry. In

---

**17.** The monthly charge for the AT & T interface device was about $6.00, as compared to a residential phone rental rate of about $1.25 a month. Litton claims that the PCA requirement increased its Key Systems customers' costs by some 18 to 35 percent, depending on the size and type of installation, over what they would have been in the absence of the requirement. In the PBX Systems market, Litton claims the PCA requirement increased its customers' costs by 8 to 20 percent. Litton Brief at 48–49.

**18.** Litton's market strategy as outlined in its 1971 Business Telephone Systems Interconnect Opportunity Plan comprised three essential steps. The first step involved the creation of an extensive distribution and service network covering major metropolitan areas. In this first stage Litton planned to sell reliable terminal equipment manufactured by established firms while it continued its own research and development efforts. In the second stage, Litton planned to introduce its own equipment to customers. In the third and final stage, the sales and distribution network would be expanded to cover the entire country, at which time Litton would sell and distribute its own products nationwide.

fact, Litton had extensive engineering and installation expertise in terminal equipment—highly sophisticated terminal equipment for special customers like airports and the Department of Defense. Litton's statistics indicate that, if anything, its performance exceeded its own expectations. Within a year and a half of its decision to enter the terminal equipment market, it was making close to one quarter of all interconnect sales. To counter AT & T's claim that Litton had no marketable products of its own in the early 1970's, Litton argues that AT & T itself was responsible for this: it refused to interconnect the innovative Litton "plexcom" switch, which was "years ahead" of anything AT & T had to offer. By this time, according to Litton, AT & T's anticompetitive efforts had taken their toll in increased prices and decreased sales. When the deButts speech made it clear that AT & T would continue to resist the implementation of *Carterfone*, Litton claims that, like many other manufacturers during that period, it simply could not remain in the market.

Ultimately, the jury agreed in the main with Litton, finding that AT & T opposed certification standards in bad faith and that other AT & T conduct involving the supply of PCAs and the sale of inside wiring was unreasonable and injurious to Litton as a competitor. The jury also, after rendering the main verdict with respect to liability and damages, found that AT & T *filed* the interface tariffs in the first instance in bad faith. Despite arguments made here that the damage award was based on a study relying on unsupported assumptions that made it impossible for the jury to estimate the damages attributable only to conduct found illegal, liability was found in a specific amount, namely, in the case of Litton *qua* competitor, $91,990,000, and in the case of Litton *qua* customer, $268,243. The sum of these figures, $92,258,243, was trebled as provided by 15 U.S.C. § 15.

## II. *DISCUSSION*

### A. *Introduction*

· As the factual summary above suggests, there is little in this case that the parties agree upon. AT & T contends that a portion of the jury's verdict and two of its factual findings must be set aside because they were made "belatedly" and as a result of coercion. Second, AT & T argues that under the *Noerr-Pennington* doctrine the jury was precluded from finding that certain practices relied on to support both the initial and the "belated" verdict were anticompetitive or predatory. Third, AT & T maintains that there was insufficient evidence to support any of the jury's factual findings and the entire verdict must therefore be set aside. Fourth, again in an evidentiary vein, AT & T claims that various rulings by the trial court judge on the admissibility of evidence so prejudiced its defense that it is entitled to a new trial. AT & T's fifth argument flanks the merits, so to speak, and attacks the jury's damage awards. Finally, AT & T argues that the entire case should have been dismissed as a sanction for Litton's discovery misconduct. Litton argues that this misconduct was an excusable oversight and that the district court's sanction—denial of any attorneys' fees—was impermissibly severe.

### B. *The "Belated" Jury Findings*

■ After eight days of deliberation, the jury found AT & T guilty of monopolization and an attempt to monopolize the relevant product market. In response to special interrogatories the jury specifically found three AT & T practices—opposition to certification, delay in providing interface devices, and conduct in connection with the sale of inside wiring—anticompetitive and predatory. Because the jury found that AT & T's monopolization was the proximate cause of Litton's injury, it entered an award for Litton as both a competitor and customer of AT & T. The jury initially failed, however, to reach unanimity on three matters: (1) whether the attempted monopolization proximately caused Litton's injury, and whether either (2) the original filing of the interface tariff or (3) delay in effecting cutover from AT & T to Litton equipment was anticompetitive or predatory. The trial judge asked the jury to at-

tempt to reach a unanimous result one way or the other on the remaining issues and the jury indicated its willingness to do so. After deliberating a short while, the jury returned with affirmative answers favorable to Litton on all three questions. AT & T makes an extensive argument that these "belated" findings were coerced and therefore should be set aside. Although the verdict on the monopoly charge can be sustained, and the damage award affirmed, if there is support for each of the initial three findings made pursuant to Federal Rule of Civil Procedure 49, *see Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 94–95 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), disposition of the threshold claim that these later findings must be set aside will enable us to consolidate our discussion of the more difficult *Noerr-Pennington* issues AT & T raises.

It was, of course, completely appropriate to submit special interrogatories to the jury, particularly in a case as complex and protracted as this one.[19] In asking the jury to specify whether it found each of the alleged predatory practices to have been proved, the trial court was merely following *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 299 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). For whatever reason, the jury did not agree unanimously on two interrogatories and the proximate cause component of the attempted monopolization charge.

There was nothing unusual, much less erroneous, in the trial court's resubmission of these questions. *See, e.g., Turchio v. D/S A/S DEN NORSKE AFRICA,* 509 F.2d 101, 105 (2d Cir.1974) (if the jury fails to answer interrogatory it is appropriate to resubmit the interrogatory "a second and third time to obtain answers to the unanswered questions").[20]

AT & T's contention that the jury was somehow "coerced" into rendering answers favorable to Litton upon resubmission cannot be squared with the facts. The jury did not indicate that it was deadlocked on these questions; it indicated that it was divided. That the jury took its task seriously and deliberated conscientiously is manifest; before rendering its initial verdict the jury requested guidance from the court as to whether it could continue if it was divided on a question. AT & T can hardly argue that the jury was predisposed to find in Litton's favor given the fact that it found *against* Litton on two out of four theories of liability and divided on a third.[21] AT & T's argument that the jury had no incentive to find against Litton on the unresolved proximate cause question because the initial verdict would stand in any event is pure speculation. Even if we were to concede AT&T's premise that the jury was likely to shirk its duty conscientiously to reconsider these questions—a premise we find highly questionable given that the jury served over five months without a single absence and deliberated for eight days[22]—the con-

**19.** The practice has been described as "usually preferable to the opaque general verdict." *Skidmore v. Baltimore & Ohio RR. Co.,* 167 F.2d 54, 67 (2d Cir.), *cert. denied,* 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371 (1948). *See also* Wright, *The Use of Special Verdicts in Federal Court,* 38 F.R.D. 199, 206 (1966) (submission of special verdicts can serve to clarify confusing or complicated litigation).

**20.** Indeed, if the jury had found against Litton on the proximate cause question relating to the attempted monopolization charge, the trial court judge might reasonably have inferred that this was inconsistent with the jury's general verdict and damage award. The record indicates that this possibility was of some concern to both the trial court judge and the attorneys for both parties. In light of the express provi-

sion in Fed.R.Civ.P. 49(b) that a trial court may "return the jury for further consideration of its answers and verdict" in order to eliminate any inconsistencies between a general verdict and special findings, we do not see how it can be error to "return the jury for further consideration" of an interrogatory it did not answer.

**21.** Specifically, the jury found against Litton on its claim that AT & T engaged in a conspiracy to monopolize (claim three) and in a conspiracy to restrain trade (claim four).

**22.** The trial court judge praised the jury at the close of the trial as follows:

Not a single juror has missed a single day because of illness or any other personal matter.... That is absolutely amazing.... You have also been the most punctual jury I

clusion that it was likely to resolve these questions in Litton's favor simply does not follow.[23]

Nor do we find anything coercive in the trial judge's instructions. The jurors were informed that their answers to the questions were "important" and that they should listen to the views of their fellow jurors without abandoning their own conscientiously held views. Far from being coercive, this instruction was completely in keeping with the recognition that:

A system which requires the unanimous verdict of a jury ... can function satisfactorily in most cases only because most jurors are reasonable ... and after a certain amount of discussion has produced a large majority in favor of one view, those in the minority may be willing to join the majority in the belief that if so many other reasonable people have a contrary view, the views of the minority may well be mistaken. Instructions ... in both state and federal courts stress the importance of jurors listening to the views of one another and making allowance for the fact that there can be a reasonable difference of opinion.

*Grace Lines, Inc. v. Motley*, 439 F.2d 1028, 1033 (2d Cir.1971) (Lumbard, C.J., *concurring*). The instructions here fall far short of those sustained in *e.g., United States v. Corcione*, 592 F.2d 111, 117 n. 5 (2d Cir.), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 974 (1979) (after jury deadlocked on criminal charge, trial judge instructed jury that it should "consult with one another and ... deliberate with a view to reaching agreement if you can possibly do so"); *United States v. Robinson*, 560 F.2d 507, 511 n. 6 (2d Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978) (jury instructed that "[i]t is important that a decision ... be reached here, and I really see no good reasons why a decision cannot be reached").[24] Litton was entitled to a jury determination on all of its claims and we do not believe the trial court judge erred either in resubmitting the claims or in instructing the jury as he did. There is no factual or logical basis for AT & T's arguments that resubmission of these questions tipped the balance in Litton's favor.[25]

## C. *AT & T's* Noerr-Pennington *Claims*

According to AT & T, the "fundamental error that pervaded the trial of this case was the failure of the trial court to recognize that the principal ... conduct upon which the judgment is based ... was protected" under the doctrine developed in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81

---

have ever had.... You have been a vindication of the jury system and all that it means.

**23.** AT & T's argument that the jury had no incentive to find against Litton on one claim because it had found for Litton on another is a criticism that can be made whenever a plaintiff's case involves multiple claims, any one of which would be sufficient to support a damage award. Thus viewed, AT & T's position is more an indictment of the jury system than an argument against resubmission.

**24.** AT & T's contention that the trial court judge "pressured" the jury into resolving the undecided questions in Litton's favor is based on the following instruction:

[A]ny question that is left unanswered creates a possible problem for the parties and the Court. I don't need to give you specific examples of that. It is a fact that we would like positive answers of either 'yes' or 'no' to the questions, *if you can possibly agree after discussing the matter again ... to see whether or not you can't in good conscience* adopt [the views of other jurors] as your own. It will clear up a lot of problems for us if you can.

(Emphasis added.)

This instruction correctly emphasized both the importance of reaching a verdict and the necessity of doing so only in accordance with the conscientiously held views of each juror. If the trial court judge had elaborated upon the "possible problem"—i.e., inconsistency between a general verdict in Litton's favor and negative finding on the attempted monopolization proximate cause question—we might be inclined to agree with AT & T that the effect could be to bias the jury. But this is precisely the effect that the trial court judge avoided by phrasing the instruction as he did.

**25.** We note that under the trial court judge's instructions the jury could have, but did not, increase the damages it previously awarded Litton. Empirically, this undercuts AT & T's contention that the jury was predisposed to find against it.

S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). AT & T Brief at 43. AT & T argues that both its opposition to certification standards and its original filing of the interface tariffs should not have been submitted to the jury because this conduct did not, as a matter of law under the evidence adduced by Litton, fall within the only exception—the so-called "sham" exception—to *Noerr-Pennington.*

*Noerr,* it will be recalled, involved a deceptive political campaign waged as part of the bitter economic feud between the railroad and trucking industries for control of the interstate, heavy freight hauling market. Trucking industry representatives sued a railroad trade association, alleging that a publicity campaign advocating legislation favorable to the railroads violated the Sherman Act because the campaign's sole purpose was to hamper the trucking industry's ability to compete with the railroads. The Court held that "the Sherman Act . . . does not apply to . . . activities compris[ing] mere solicitation of governmental action with respect to the passage and enforcement of laws," 365 U.S. at 138, 81 S.Ct. at 530, irrespective of whether the activities might be considered fraudulent or deceptive. The *Noerr* holding was, strictly speaking, a matter of statutory construction,[26] but First Amendment concerns clearly informed the decision. The Court feared that an expansive construction of the Sherman Act would impinge upon the right to petition and impair the government's ability "to take actions through its legislature and executive that operate to restrain trade." 365 U.S. at 137, 81 S.Ct. at 529.[27] These factors, as well as the "essential dissimilarity" between joint efforts to seek legislation and "agreements traditionally condemned" under the Act, *id.* at 136, 81 S.Ct. at 529, led the Court to conclude that Congress could not have intended the Act to reach such behavior. In reaching this result, the Court found the question of intent irrelevant, stating that "insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." 365 U.S. at 139–40, 81 S.Ct. at 530. In dictum, however, the Court indicated that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533.

The *Pennington* decision restated, and to some extent arguably amplified, *Noerr.* In *Pennington* an industry union and large firms urged the Secretary of Labor to establish minimum wage levels that would have the effect of squeezing out smaller firms.[28] The Court held that "*Noerr* shields

---

**26.** *See* 365 U.S. at 132 n. 6, 81 S.Ct. at 526 n. 6. *See generally,* Fischel, *Antitrust Liability for Attempts to Influence Governmental Action: The Basis and Limits of the* Noerr-Pennington *Doctrine,* 45 U.Chi.L.Rev. 80, 82–84 (1977).

**27.** The Court was concerned that construing the Sherman Act to reach essentially political activity would hamper the "ability of the people to make their wishes known to their representatives," 365 U.S. at 137, thus invoking a traditional First Amendment theme. *See also id.* at 138, 81 S.Ct. at 530; A. Meiklejohn, Political Freedom 26–28 (1948); Bork, *Neutral Principles and Some First Amendment Problems,* 47 Ind.L.J. 1 (1971).

**28.** The conduct challenged in *Pennington* included efforts to induce the TVA, a government corporation, to curtail its purchases of coal at reduced prices on the spot market. The Su-

preme Court did not address the issue, but some lower courts have concluded *Noerr-Pennington* does not immunize anticompetitive efforts directed at government agencies acting in a proprietary capacity—i.e., as buyers or sellers. *See, e.g., Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Local No. 150,* 440 F.2d 1096, 1099 (9th Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); *George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25, 33 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970). A Fifth Circuit case, and a district court decision in the Third Circuit, are *contra. See Household Goods Carriers' Bureau v. Terrell,* 452 F.2d 152 (5th Cir.1971) (reh. en banc); *United States v. Johns-Manville Corp.,* 259 F.Supp. 440 (E.D.Pa.1966).

from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.... Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." 381 U.S. at 670, 85 S.Ct. at 1593. *Pennington* made it clear that efforts directed at executive officials or agencies—as distinguished from the legislative and publicity efforts involved in *Noerr* —were protected. *Pennington* also emphatically reaffirmed *Noerr's* holding that anticompetitive intent did not make an otherwise legitimate attempt to secure governmental action or express a political position illegal; the Court stated that "[s]uch conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.*

The last case generally cited in any exegesis of the *Noerr-Pennington* doctrine is *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). This case involved a group of trucking companies that opposed " 'with or without probable cause, and regardless of the merits of the cases,' " each and every license application made by the group's competitors to a state regulatory agency. *Id.* at 512, 92 S.Ct. at 612. *California Motor Transport* both expanded and limited the *Noerr-Pennington* doctrine. Although the Court ultimately held against the defendants, it broadened and strengthened the base of the doctrine by holding, first, that it applied to administrative and adjudicative proceedings and, second, that it was constitutionally based.[29] At the same time, the Court imposed limits upon the doctrine by holding that the plaintiff's allegations triggered the application of the *Noerr* sham dictum.

AT & T points primarily to the *Noerr* and *Pennington* decisions and argues that even if its conduct was undertaken for anticompetitive reasons, it was nevertheless protected. To this Litton replies that *Noerr-Pennington* is inapplicable because AT & T injured Litton not by requesting or as a result of governmental action, but by virtue of what AT & T itself did in filing and maintaining the interface tariffs while opposing the only feasible alternative—certification standards—in bad faith. In the alternative, Litton maintains that this case presents a "paradigm of the 'sham' exception to the *Noerr* doctrine." Thus, there are two strings to the Litton bow: inapplicability of the *Noerr-Pennington* doctrine because the injury flowed from actions not within the scope of the doctrine, and applicability of the "sham" exception. Judge Meskill and I agree with Litton on both counts for reasons we set forth below; Judge Kearse concurs only on the second ground and does not join in the immediately following portion of the opinion.

1. *Applicability of the* Noerr-Pennington *Doctrine*

■ AT & T characterizes its filing of the interface tariffs after *Carterfone* as an "application" to the FCC, and contends that "*Noerr-Pennington* ... does not permit antitrust liability to be based on such applications to a regulatory agency." AT & T Brief at 82. In essence, AT & T's argument is that its conduct in devising and filing the tariffs is immunized because the tariffs were contested and AT & T defended them before the FCC. If this argument were accepted, a common regulatory practice[30]

**29.** 404 U.S. at 510–11, 92 S.Ct. at 611. The *California Motor Transport* Court squarely held that First Amendment rights of petition and association underlay the *Noerr-Pennington* doctrine. The *Noerr* Court only went so far as to suggest that an interpretation of the Sherman Act contrary to the one it adopted "would raise important constitutional questions." 365 U.S. at 138, 81 S.Ct. at 530.

**30.** *See, e.g.,* 14 C.F.R. § 221.3 (1982) (Civil Aeronautics Board) (requiring all domestic and foreign air carriers to file "tariffs showing all

·rates, fares, and charges" for air transportation); 18 C.F.R. § 35.1(a) (1982) (Federal Energy Regulatory Commission) (requiring "[e]very public utility [to] file ... full and complete rate schedules ... setting forth all rates and charges for any transmission or sale of electric energy"); 46 C.F.R. § 531.3 (1981) (Federal Maritime Commission) (requiring "[e]very domestic offshore carrier [to] file ... tariffs showing its actual rates, fares and charges"). Filing requirements like those cited above and

designed to protect consumers would instead shield from antitrust liability the very entities the practice seeks to restrain and regulate. In an earlier case involving this same defendant we concluded that pervasive regulation of the telecommunications industry does not, without more, confer antitrust immunity. *See, Northeastern Telephone Co.,* 651 F.2d at 83; *see also International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 935–36 (9th Cir.1975); *cf., United States v. American Telephone & Telegraph Co.,* 524 F.Supp. 1336, 1357–60 (D.D.C.1981) (declining to decide whether compliance with regulatory mandates insulates a defendant from antitrust liability.) If extensive substantive regulation does not· warrant an antitrust exemption, then surely an essentially procedural aspect of regulation—tariff filing—cannot.

Apart from the obvious difficulty of reconciling the effect of AT & T's *Noerr-Pennington* argument with the Supreme Court's repeated admonition that antitrust exemptions are to be countenanced only where "there is a 'plain repugnancy between the antitrust and regulatory provisions,'" *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975), *quoting United States v. Philadelphia National Bank,* 374 U.S. 321, 350, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963); *see also Silver v. New York Stock Exchange,* 373 U.S. 341,

357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963), we believe that AT & T's position must be rejected for a more fundamental reason. AT & T erroneously assumes that a mere *incident* of regulation—the tariff filing requirement—is tantamount to a request for governmental action akin to the conduct held protected in *Noerr* and *Pennington.* But in this case, as in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962), the *Noerr-Pennington* doctrine is "plainly inapposite" because AT & T was "engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws." The decision to impose and maintain the interface tariff was made in the AT & T boardroom, not at the FCC; AT & T's power to exclude Litton and other competitors from the telephone terminal equipment market resulted not from the FCC's regulatory authority but from AT & T's exclusive control of the telephone network.[31] AT & T cannot cloak its actions in *Noerr-Pennington* immunity simply because it is required, as a regulated monopoly, to disclose publicly its rates and operating procedures. The fact that the FCC might ultimately set aside a tariff filing does not transform AT & T's independent decisions as to how it will conduct its business into a "request" for governmental action or an "expression" of political opinion.[32] Similar-

those imposed by the FCC under 47 C.F.R. § 61 *et seq.* (1981) hearken back to the original justification for administrative regulation of industries affected with a public interest: preventing discrimination on the basis of price or terms of service. *See generally* Jaffe, *The Effective Limits of the Administrative Process: A Reevaluation,* 67 Harv.L.Rev. 1105, 1106–07 (1954).

31. *See also United States v. American Telephone & Telegraph Co.,* 524 F.Supp. 1336, 1352–53 (D.D.C.1981) (analyzing AT & T's monopoly over local telephone service in terms of the "essential facility" or "strategic bottleneck" doctrine).

32. Under applicable federal regulations, AT & T could have at any time revoked the interface tariff on its own initiative by filing another tariff. 47 C.F.R. § 61.57(a) (1981). We concluded almost ten years ago in *American Tele-*

*phone & Telegraph Co. v. FCC,* 487 F.2d 865, 871–76 (2d Cir.1973) that sections 203 and 205 of the Communications Act of 1934 contemplated "carrier initiated rate changes" that the FCC could set aside only in the manner prescribed by the statute itself. The obverse of this, of course, is that a tariff is an independent exercise of the carrier's business judgment that receives no government imprimatur until and unless the FCC reviews the tariff in response to a complaint or upon its own initiative. A number of other courts have reached the same conclusion. *See Phonetele, Inc. v. American Telephone & Telegraph Co.,* 664 F.2d 716, 733, 735 (9th Cir.1981) (FCC does not adopt or approve tariff filings it permits to become effective; tariff filings are "the product of the regulated entity's independent initiative and judgment"); *Sound, Inc. v. American Telephone & Telegraph Co.,* 631 F.2d 1324, 1330 (8th Cir. 1980) ("Bell, not the FCC, proposes its rates,

ly, the FCC's failure to strike down a tariff at the time of its filing does not make the conduct lawful, particularly where, as in this case, the agency specifically declines to rule on a tariff's legality.

We therefore follow the plurality in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 601–02, 96 S.Ct. 3110, 3122, 49 L.Ed.2d 1141 (1976), where four Justices rejected AT & T's *amicus curiae* argument that a tariff filing was protected as a request for governmental action under *Noerr-Pennington.* In *Cantor,* the plurality held that a tariff filed by an electric utility could not evade scrutiny under the antitrust laws simply because it was filed in accordance with state law and approved by a state agency. The *Cantor* plurality stated that

> nothing in the *Noerr* opinion implies that the mere fact that a state regulatory agency may approve a proposal included in a tariff, and thereby require that the proposal be implemented until a revised tariff is filed and approved, is a sufficient

reason for conferring antitrust immunity on the proposed conduct.

*Id.* Chief Justice Burger did not concur in that portion of the plurality's opinion discussing *Noerr-Pennington,* but his objection went to the plurality's construction of the "state action" exemption doctrine under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and he said nothing in disagreement with the plurality's interpretation of *Noerr.* Justice Blackmun's concurrence also did not address *Noerr,* but rather would rely on "a rule of reason, taking it as a general proposition that state-sanctioned anticompetitive activity must fall like any other if its potential harms outweigh its benefits." 428 U.S. at 610, 96 S.Ct. at 3127. Although we are aware that plurality opinions can provide only limited guidance on an issue a majority of the Court did not address,[33] we believe that to the extent that both Justice Blackmun and Chief Justice Burger were unwilling to equate "state action" with a utility's adherence to a tariff filing required by state law, they would reject *a fortiori* the argument

---

regulations and restrictions .... In filing each tariff, Bell implements its own business judgment ...."); *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365, 374 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978) ("[T]he tariff provisions of the Communications Act ... embody a considered legislative judgment that carriers should in general be free to initiate ... new rates or services ... unless and until the Commission, after hearing, determines that such rates or practices are unlawful ....").

We note that AT & T's argument does not rely on the "filed tariff" doctrine of *Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 162, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922). *See City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 929 (2d Cir.1981) ("filed tariff" doctrine inapplicable where regulatory agency expressly refuses to commit itself and tariff is ultimately disapproved).

**33.** The Court has indicated that in interpreting plurality holdings lower courts should look to the "narrowest ground" relied upon in a concurring Justice's opinion. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (plurality opinion). Although this rule seems of limited utility where, as here, the concurring Justices do not address the issue in question, it seems plausible to

assume that if either Chief Justice Burger or Justice Blackmun felt there was merit to the *Noerr-Pennington* argument made by the defendant or AT & T as *amicus,* they would not have concurred in the judgment. Nor is it entirely clear that the dissenting opinion written by Justice Stewart and joined by Justices Powell and Rehnquist would hold AT & T's conduct in this case protected under *Noerr-Pennington.* Although the dissenting opinion stated that

> *Parker, Noerr,* and *Goldfarb* [*v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)] point unerringly to the proper disposition of this case .... The utility company ... engages in two distinct activities: It proposes a tariff and, if the tariff is approved, it obeys its terms. The first action cannot give rise to antitrust liability under *Noerr* and the second—compliance with the terms of the tariff under the command of state law—is immune from antitrust liability under *Parker* and *Goldfarb.*

428 U.S. at 624, 96 S.Ct. at 3133; the tariff in question in *Cantor* was apparently specifically approved by the state regulatory agency. *Id.* at 583, 96 S.Ct. at 3114. In this case, of course, the FCC took pains to state that permitting the tariff to take effect was not to be construed as approval of the tariff.

that the tariff filing amounted to a request for governmental action.[34]

Much of our analysis relating to the filing of the interface tariffs applies to AT & T's opposition to certification. Opposition to certification is simply the other side of the interface tariff coin; AT & T's filing and maintenance of the PCA requirement was the very embodiment of opposition to the only feasible alternative—certification standards. To be sure, AT & T argues that its "opposition" to the development of certification standards was by definition protected under *Noerr-Pennington* because it amounted to no more than espousing a position before an administrative body. But our review of the evidence presented by Litton suggests that AT & T's *post hoc* characterization of the opposition-to-certification issue is distorted. Litton's evidence indicated that AT & T made unsupportable claims to the FCC regarding network harm, feigned cooperation with the PBX Advisory Committee's efforts to develop certification standards, and generally attempted to buy as much time as possible to improve its own competitive position at the expense of Litton and other competitors.[35] The effect of this was to maintain the interface tariffs and whatever anticompetitive or exclusionary effect that flowed therefrom. AT & T's opposition to certification accordingly embraced much more than merely advocating a position before the FCC.

### 2. The "Sham Exception"

Even if our conclusions regarding the applicability of *Noerr-Pennington* are incorrect, the doctrine is subject to the sham exception suggested by way of dictum in *Noerr* and relied on in *California Motor Transport.* In *California Motor Transport* the defendant instituted proceedings challenging the regulatory approval sought by the plaintiff not with the expectation of prevailing but for purposes of harassment and delay. The Court held that where "the administrative and judicial processes [are] abused," 404 U.S. at 513, 92 S.Ct. at 613, in an attempt to stifle competition, *Noerr-Pennington* is inapplicable. The focus of the Court's concern in *California Motor Transport* was the "illegal result" of the abuse, specifically, "effectively barring respondents from access to the agencies and the courts." *Id.*[36] Although the Court conceded that an "abuse" standard involved "a difficult line to discern and draw," a lead-

---

**34.** We note that Chief Justice Burger stated in his concurring opinion that the plurality "correctly concludes: 'The Commission's approval of respondent's decision to maintain such a program does not . . . implement any statewide policy.'" 428 U.S. at 604, 96 S.Ct. at 3124. The Eighth Circuit has recently read *Cantor* as not providing *Noerr-Pennington* protection for tariff filings. *See City of Kirkwood v. Union Electric Co.,* 671 F.2d 1173, 1181 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 46, 74 L.Ed.2d 54 (1982). *See also United States v. Title Insurance Rating Bureau of Arizona, Inc.,* 517 F.Supp. 1053, 1059–60 (D.Ariz. 1981).

**35.** We review this evidence in greater depth in our discussion of the sham exception, *infra,* but we believe that this evidence tends to show that the conduct fairly considered under the rubric of "opposition to certification" amounted to more than simply an expression of AT & T's opinion. *Cf. City of Kirkwood v. Union Electric Co.,* 671 F.2d at 1181 ("The *Noerr-Pennington* doctrine will not protect a utility which manipulates the federal and state regulatory processes to achieve anti-competitive results. It is not for expression of opinion that [the plaintiff] seeks to compel [the defendant] to

respond in damages, but rather for [the defendant's] conduct in the market place.").

**36.** We reject the suggestion made in AT & T's brief that the applicability of the sham exception turns on whether a competitor is barred from access to administrative agencies or the courts. The Supreme Court's opinion in *California Motor Transport* cited access barring as one example of the illegal results that might flow from abuse of the administrative process. One of the allegations in *California Motor Transport* that the Court found sufficient to trigger the sham exception is similar to the one Litton made in this case, namely that the defendants "became 'the regulators of the grants of rights, transfers and registrations.'" 404 U.S. at 511, 92 S.Ct. at 612. More recent Supreme Court opinions have referred to the sham exception's availability without regard to the necessity of "access barring," *see, e.g., City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 405, 98 S.Ct. 1123, 1132, 55 L.Ed.2d 364 (1978); *Vendo Co. v. Lektro-Vend Corp.,* 433 U.S. 623, 635 n. 6, 97 S.Ct. 2881, 2889 n. 6, 53 L.Ed.2d 1009 (1977) (Rehnquist, J., concurring).

ing antitrust commentator has suggested that this line is crossed when

> the defendant's activity was intended to injure the plaintiff directly rather than through a governmental decision. When the antitrust defendant had not truly sought to influence the governmental decision, his invocation of governmental machinery is a sham.... [W]here he had no reasonable expectation of obtaining the favorable ruling, his effort to do so was a sham.

P. Areeda, Antitrust Law ¶ 203.1a (Supp. 1982).

Professor Areeda's view of the heart of the sham exception—invoking the process of administrative or adjudicatory decision-making for the injury that the process alone will work upon competitors—possesses the virtue of accommodating the Supreme Court's concern in *California Motor Transport* that these processes not be abused with impunity behind claims of *Noerr-Pennington* immunity. To be sure, there are difficulties involved in determining whether a defendant "truly sought to influence the governmental decision" and whether there was a "reasonable expectation" of doing so. One indicium of whether a defendant could have reasonably expected its position to prevail, and therefore whether the invocation of process was actually an attempt to influence a decision rather than an attempt to interpose delay, is a "pattern of baseless, repetitive claims." 404 U.S. at 513, 92 S.Ct. at 613. Thus, we held in *Landmarks Holding Corp. v. Bermant,* 664 F.2d 891, 896 (2d Cir.1981) that an attempt by a defendant to delay the construction of a competitor's shopping mall by carefully orchestrating a series of court and administrative actions designed to defeat a zoning variance was not protected under *Noerr-Pennington.*

But repetition is but one indicium of a sham claim; under *California Motor Transport's* abuse standard "many other forms of illegal and reprehensible practice ... may corrupt the administrative or judicial

processes and ... result in antitrust violations." 404 U.S. at 513, 92 S.Ct. at 613. In *Landmarks Holding,* for example, our conclusion that the judicial and administrative processes had been abused was based in part upon "unethical lawyer conduct" which included, *inter alia,* requests for delays that the defendant's own documents proved were "purely bull." 664 F.2d at 894.[37]

■ In deciding whether Litton adduced sufficient evidence to demonstrate that AT & T's conduct in connection with the interface tariff and opposition to certification was a sham, we are of course required to view the evidence in the light most favorable to Litton, giving it the benefit of all inferences that the evidence fairly supports regardless of whether contrary inferences might be drawn. *Continental Ore Co.,* 370 U.S. at 696, 82 S.Ct. at 1409; *Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.,* 539 F.2d 907, 911 (2d Cir.1976). With this in mind, and with reference to the Litton case set out above in I(B)(2) which we think is fairly supported by the evidence, we believe that the sham exception is applicable to AT & T's conduct. As early as the ultimate decision in *Hush-A-Phone,* AT & T knew that the FCC's basic position was that AT & T could not exclude "any device"—a category clearly including telephone terminal equipment—absent a showing of actual harm. The lengthy litigation in *Carterfone* was a matter of industry-wide knowledge and interest; the decision was viewed at the time as a smashing blow to AT & T and as a "window of opportunity" for AT & T's competitors. Anyone reading the language of the *Carterfone* rehearing decision and the Tariff Review Group Task Force Report we have quoted above could conclude that neither filing of the interface tariff nor opposition to certification squared with the FCC's mandate in *Carterfone.*

AT & T nevertheless consistently maintained that the PCA requirement was necessary to protect the telephone network.

---

**37.** *Cf.* Note, *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Adjudicatory Agencies: Analogies to Mali-* *cious Prosecution and Abuse of Process,* 86 Harv.L.Rev. 715, 726–35 (1973).

This was not so much a "pattern of ... repetitive claims" as it was a unitary, ongoing claim.[38] There was sufficient evidence to allow the jury to conclude that this claim was "baseless"; AT & T's own reports pointed out that the interface device was redundant, uneconomic, and unnecessary. Time and again AT & T inveighed against the harm that would flow from certification standards without once demonstrating a single instance of harm from what its own reports indicated was a trend in the direction of "illegal" or "unauthorized" interconnection. AT & T asserts that evidence of harm was difficult to produce because of its transitory nature and because the PCA requirement was effective, but the jury could have reasonably concluded—on the basis of evidence indicating that governmental agencies and some 1600 non-AT & T telephone companies were interconnected without a PCA—that AT & T's ongoing claim of harm to the system was baseless.

There was also evidence tending to indicate that AT & T affirmatively misled the FCC with respect to the need for the PCA requirement and the difficulty of developing certification standards. For example, while it opposed certification standards pursuant to the policy announced before NARUC in the deButts speech, AT & T provided the FCC with a study that its own author believed did not prove anything. Similarly, AT & T's own documents indicate that many of its senior executives thought that certification standards could be developed within a matter of months. Indeed, some AT & T documents demonstrated that many AT & T executives believed the standards were inevitable regardless of the position AT & T adopted.

Not surprisingly, AT & T argues that intra-corporate division of opinion on an issue of this nature is inevitable and therefore not indicative of an attempt to subvert the regulatory process. But again, a review of the evidence in the light most favorable to Litton compels us to conclude that the

jury could reasonably have inferred that AT & T opposed the development of certification standards in a manner calculated to delay the day when *Carterfone's* pro-competitive mandate would become fully effective. Litton introduced evidence, and AT & T concedes in its brief, that AT & T "did not complete some of its 'homework assignments' on time" in connection with the PBX Advisory Committee's efforts to develop certification standards. AT & T Brief at 20. And, although AT & T had decided in March of 1973 that it would oppose certification standards, it continued to work with the Advisory Committee in accordance with an internal "Tactics Memorandum" which concluded that withdrawing from the committee would accelerate "decisions in favor of certification." This evidence is sufficient to support an inference that AT & T did what it could to delay and obfuscate the efforts undertaken by the FCC and other interested parties to develop certification standards. As a textbook example of a monopolist in control of an essential facility, *see United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), it is difficult to conclude that these efforts could not have amounted to an abuse of the administrative process. The result, to draw an obvious analogy to *California Motor Transport,* was that Litton and other terminal equipment competitors were barred from access to the telephone network system.

AT & T had no realistic hope that the FCC would approve the interface device; its own people thought that the device was a redundant "artificial barrier" to competition. It nevertheless consciously pursued a policy of delaying the time when the FCC would strike down the PCA requirement. It implemented this policy by making baseless claims relative to potential harms to the network while opposing certification standards in every way possible. AT & T argues that it actually wanted the FCC to

---

**38.** The Circuits are split on whether a single claim is sufficient to support application of the sham exception. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 674 F.2d 1252, 1266–67 & n. 24 (9th Cir.1982) (concluding that a single claim can be a sham and citing cases on both sides of the proposition).

approve the interface device and reject certification standards, but as Professor Areeda points out

> [t]o be sure, [a competitor] would always be pleased to obtain a governmental decision against his rival. But where he had no reasonable expectation of obtaining the favorable ruling, his effort to do so [is] a sham.

P. Areeda, *supra*, at 5. AT & T's conduct was not undertaken in the hope of influencing governmental action, but in the hope of delaying it.[39] *See Landmarks Holding Corp. v. Berman, supra.* As such, it amounted to the sort of abuse of the administrative process that falls within the *Noerr-Pennington* sham exception. The jury's determination to that effect is sustainable if the instructions were correct.

### 3. *The Trial Court's* Noerr-Pennington *Instructions*

■ AT & T challenges the *Noerr-Pennington* instructions on two grounds. First, AT & T claims that the instructions entitled "Opposition to Registration" and "First Amendment Protection and the Bad Faith Exception" had the effect when taken together of denying it any *Noerr-Pennington* defense because the jury could have premised its verdict merely on anticompetitive intent. Second, AT & T argues that the First Amendment values that *Noerr-Pennington* reflects require the use of a "clear and convincing" rather than a "preponderance" evidentiary standard.

AT & T's first point can be answered by reviewing the jury instructions, as we must, in their totality. *See, e.g., Norfleet v. Isthmian Lines, Inc.,* 355 F.2d 359, 362–63 (2d Cir.1966). AT & T maintains that the instructions were flawed because they established a "good faith/bad faith" dichotomy that conditioned the availability of the *Noerr-Pennington* defense on good faith, and equated bad faith with anticompetitive intent. The instructions that AT & T objects to are set forth in the margin.[40] Because we must assume that the jury discharged its obligation to apply the law in accordance with the trial judge's instructions, our review is limited to whether the instructions misled the jury as to the applicable law. AT & T's brief fails to consider, as we must on review, that portion of the charge where the court explicated what it meant by good faith and bad faith. That portion follows:

> You are also instructed that petitioning an administrative agency such as the

**39.** Professor, now Circuit Judge, Bork has suggested that the antitrust law must develop standards to address the anticompetitive effects of litigation and administrative actions instituted solely to harass and injure a competitor's rivals. *See* R. Bork, The Antitrust Paradox 357 (1978). The need to ensure that the regulatory processes not be used to thwart competition seems all the more pressing where, as here, there is serious doubt regarding whether the process can function at all without the regulated entity's full cooperation. *See United States v. American Telephone & Telegraph Co.,* 524 F.Supp. at 1359 (former Chief of FCC's Common Carrier Bureau testified at trial that FCC may be "incapable of effectively regulating a company of AT & T's size, complexity, and power").

**40.** The court's charge on the issue of "Opposition to Registration"—before the *Noerr-Pennington* defense was mentioned—was as follows:

> You have also heard about Bell's opposition to proposals made before the FCC that the PCA tariffs be replaced by various programs of certifying or registering equipment with the FCC. The question for your decision is whether Bell's opposition was interposed in bad faith for the purpose of excluding competition or whether Bell took this position because it believed that the registration proposals being made were not in the public interest and would not provide sufficient protection to Bell System employees, customers and the telephone network.

AT & T Brief at 63. AT & T correctly argues that a "purpose of excluding competition" does not suffice to create antitrust liability. The charge went on to say:

> Many of these actions, if successful, might be harmful to a competitor. Nevertheless, the First Amendment guarantees that persons or corporations may participate in good faith efforts to influence the passage or enforcement of laws or government regulations or to influence public officials regardless of whether the results of the government action they seek would be harmful to competition.

*Id.* at 64. AT & T argues that the jury was not given a definition of "good faith," but "bad faith" had just been defined as meaning "for the purpose of excluding competition."

FCC or seeking review in the courts may result in delays because administrative or judicial procedures are often time consuming. Creating such delays does not constitute willful exercise of monopoly power as long as the petition or application to the courts is based on a good faith interest in influencing the agency or obtaining a court ruling.

However, there is an exception to the general rule that efforts to influence public officials do not violate the antitrust laws, and that is the so-called sham or bad faith exception. If a campaign, ostensibly directed toward influencing government action, is a mere sham or artifice to cover what is essentially nothing more than an attempt to smother competition by a pattern of knowingly filing baseless claims or making misrepresentations to administrative agencies in a way designed to deprive competitors of meaningful access to those agencies, the First Amendment protections are lost and the Sherman Act applies.

To be sure, the contours of the sham exception are far from clear; the courts have themselves had difficulty defining the doctrine. See Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the* Noerr-Pennington *Doctrine,* 45 U.Chi.L.Rev. 80, 104 (1977). The instruction here apprised the jury that "creating . . . delays" did not constitute an antitrust offense regardless of anticompetitive intent. While the instruction might have been more explicit as to the nature of

bad faith, it accurately, if in general terms, tracked the Supreme Court's explication of the sham exception in *California Motor Transport,* and comported in its essentials with our discussion of the sham exception, *supra.* We cannot agree that the instructions were erroneous when viewed as a whole.

█ The trial court judge did not charge the jury that the sham exception had to be demonstrated by "clear and convincing" evidence. While AT & T cites libel, patent, and fraud cases in support of its argument, it points to no authority holding that the sham exception should be subject to the higher standard of clear and convincing evidence.[41] AT & T argues that the standard should be required in cases such as this to avoid a chilling effect on speech. We recognize that the standard of proof may well be a substantive element of a claim or defense, *see, e.g., Palmer v. Hoffman,* 318 U.S. 109, 117, 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943), but by requiring a plaintiff to prove that a defendant's conduct was a sham, the Supreme Court has already struck a rough balance between the competing First Amendment and antitrust interests. And as the Court pointed out in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972), the antitrust laws are as important to the preservation of economic freedom and the free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. We see no reason to impose any

41. The libel cases include *New York Times Co. v. Sullivan,* 376 U.S. 254, 285–86, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964) and *Yiamouyiannis v. Consumers Union of United States, Inc.,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980).

The fraud and civil perjury cases include: *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 597 n. 2, 600 (2d Cir.1978) (securities fraud); *Geller v. Commissioner of Internal Revenue,* 556 F.2d 687, 690 (2d Cir.1977) (income tax fraud); *McDonnell v. American Leduc Petroleums, Ltd.,* 456 F.2d 1170, 1176 (2d Cir.1972) (fraud under New York and California law); *Barr Rubber Products Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1120–21 (2d Cir.), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970) (civil perjury). *See*

*also* 86 Harv.L.Rev., *supra* note 37, at 724–25 (recommending clear and convincing evidence standard for sham exception claims).

The patent case is *Cataphote Corp. v. De-Soto Chemical Coatings, Inc.,* 450 F.2d 769, 772 (9th Cir.1971), *cert. denied,* 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972); *see also Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 996 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980) (allegation in antitrust case that patentee's infringement suit prosecuted with knowledge of patent invalidity).

We take due note that the charge in *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.1983), was put in terms of "clear and convincing" proof.

higher burden of proof on the antitrust plaintiff asserting sham than would ordinarily be applicable in any civil issue. *See Herman & MacLean v. Huddleston,* —— U.S. ——, ——, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (preponderance of the evidence standard applicable in securities fraud action under Section 10(b), noting that the interests of defendants in such cases do not differ from the interests of defendants "sued for violations of . . . antitrust . . . laws, for which proof by a preponderance of the evidence suffices").

### D. *Sufficiency of Proof*

■ Our discussion above indicates that we believe there was ample evidence to justify the jury's findings regarding the filing of the interface tariff and opposition to certification. We also conclude, after reviewing the evidence in the light most favorable to Litton, that the jury could reasonably have found that AT & T's conduct in connection with the supply and installation of PCAs, the sale of inside wiring, and "cut-over" from AT & T to Litton equipment was predatory.

AT & T argues that Litton's evidence as to delays in the supply and installation of PCAs consisted of no more than "some vendor and customer complaints." But Litton's evidence, some of which we summarize here, tended to show that PCA shortages were chronic, that they were intentionally maintained or "contrived," and that AT & T misled the FCC with respect to the magnitude of this problem. For example, Litton introduced a 1970 memorandum written by an AT & T vice president stating that AT & T had

> repeatedly been contacted by the FCC staff and outside attorneys with respect to connecting arrangements not being available. So far we have been able to placate the situations with explanations of "a possible misunderstanding or only a temporary delay" and assurances that no serious supply problems exist—followed of course by a four alarm fire approach to meet the particular demand. It is doubtful that this approach will continue to

avoid formal action of some sort by the FCC.

The shortages nevertheless continued, as evidenced by complaints received by AT & T from its own local affiliates.

In June of 1972, for example, Illinois Bell, in a telex to AT & T headquarters in New York, explained that because "so many defective units [KS 20721 couplers] have been received we have difficulty in providing this interface unit and meeting customer due dates." And, in October of 1972, an Ohio Bell executive stated in a letter to Ohio Bell's Assistant Vice President that "[A]n increasing number of vendors have complained bitterly because of our failure to supply this equipment. In many recent cases we have been unable to even quote any kind of a realistic delivery date." This same letter posed a question that no doubt puzzled the jury:

> How can we continue to insist on the use of an interconnect device when we are unable to provide such a device? It seems to me that these problems must be given the highest level of attention at Ohio Bell, Western Electric and A.T. & T. before we end up with a large-scale customer revolt and potential legal action for restraint of trade.

AT & T's response to this letter confirmed the existence of a "critical supply situation . . . throughout the system," which resulted in 76% of customers' PCA requests in New England being "missed" by an average of 10 days, although AT & T had an average lead-time of 24 days to fill the requests. The shortages were discussed at a June 14, 1973 meeting of the Bell Interconnecting Equipment Coordinating Committee and the minutes of the meeting disclose recognition of "some very serious service complaints" and "extreme service problems" with certain PCA hardware.

We believe that the evidence thus revealed more than isolated "customer and vendor" complaints; Litton's evidence tended to show that AT & T was aware of PCA supply problems and failed to take the steps necessary to correct them. In view of AT & T's own policy of requiring interconnec-

tion only through a PCA, we do not think it was unreasonable for the jury to conclude that these shortages were orchestrated to frustrate Litton and other terminal equipment competitors.

The jury could also reasonably have inferred from the evidence introduced by Litton that some of AT & T's practices in connection with "inside wiring"—i.e., wiring owned by AT & T but located on or in a customer's premises—were anticompetitive. AT & T professed its willingness to sell the wiring if a customer wanted to "cut over" from AT & T to a competitor's equipment, but Litton's evidence tended to show, first, that AT & T would often negotiate in bad faith by quoting unreasonably high prices for the wiring and, second, that in "many, many instances" AT & T chopped this wiring off flush with a customer's walls. Indeed, a South Central Bell general manager noted at one point that the practice of destroying inside wiring was "unreasonable and could very well be interpreted as . . . vindictive." That is the conclusion the jury

reached and we see no reason to overturn it.[42]

Finally, AT & T argues that Litton failed to introduce sufficient evidence to justify the jury's conclusion that AT & T's delay in making "cutovers"—the final step involved in switching from AT & T to non-AT & T equipment—was anticompetitive. The record indicates, however, that Litton introduced, *inter alia,* testimony from representatives of various terminal equipment competitors to the effect that cutover delays frustrated their attempts to install equipment on schedule. The jury could have concluded from this and other evidence of intransigent cutover practices that AT & T's conduct injured Litton and other terminal equipment competitors.[43]

AT & T takes the position that these practices amounted to no more than *de minimis* injury under *Berkey Photo Inc.,* 603 F.2d at 288–89; *see also Federal Prescription Service Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 268–71 (D.C.Cir.

**42.** AT & T argues that the only evidence was that on three isolated occasions one operating company, Southwestern Bell, chose not to sell its cable to Litton but that even as to these instances there was no showing of bad faith on Southwestern Bell's part; again the evidence is argued to be insufficient under *Berkey.* But the former Litton BTS Vice President of Operations said:

In installations, we would find that when a customer was having the Bell system removed, the Bell folks would just come in like with an axe and just chop up the multipin connector wiring at walls. Gosh, darndest thing I ever saw. Just couldn't believe people would do that. That particular thing we tended to get over over a period of time and we ended up up [sic] some coordination meetings to try get the Bell folks to leave the premises on a reasonable basis as opposed to one of appearing to be mad.

He added that:

A. It wasn't one customer. It was many many installations where that would occur and I just do not remember.
Q. Did you ever observe that situation?
A. Yes. Because I couldn't believe it, so I went and looked myself.
Q. How often did you do that?
A. Twice.
. . . .
Q. When you referred to damage, is it the same damage at each customer's premises?

A. The two that I observed was the same damage and that was just going along and cutting the wires at the walls.
Q. When you say cutting the wires at the walls, can you be a bit more specific about the nature of the damage?
A. Yes. There are pairs of wires that are grouped together in cables and are wrapped in some plastic covering that come to a key phone or single phone or whatever, different size connectors. They would be chopped right off at the wall so you had no capability of coming to those wires with your connectors and so forth, even though you might be purchasing a cable from them.

**43.** AT & T points to *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 94 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), where we set aside a jury verdict because the plaintiff "introduce[d] [no] evidence whatsoever" that an AT & T affiliate provided poor service to the plaintiff's customers *after* the purchase and installation of the plaintiff's terminal equipment. But Litton's claim is that shortages, missed cutover dates, etc., prevented it both from satisfying existing customers and luring prospective customers because it could not "cutover" on schedule. Unlike *Northeastern,* there is evidence in this case to support Litton's claim that the problems associated with delay were real.

1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). We disagree. AT & T's *seriatim* attacks upon the jury's findings invite us to approach Litton's proof as if this case involved "completely separate and unrelated lawsuits . . . tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co.,* 370 U.S. at 698–99, 82 S.Ct. at 1410. But on the basis of any one of these practices—all of which were supported by sufficient evidence—the jury could have reasonably concluded that Litton suffered competitive injury.[44] The jury's finding that this conduct was predatory, i.e., undertaken with an anticompetitive intent in an attempt to injure Litton, is all the more reasonable given the synergistic nature of these practices in relation to Litton's primary claim that it was excluded from the terminal equipment market. AT & T argues at length that Litton failed to prove that the shortages, delays, and inside wiring episodes were deliberate, but this ignores the fact that "[c]ircumstances in which intent can be inferred other than from conduct which is itself exclusionary will no doubt be rare. . . . [T]he relationship between intent and conduct is intimate: thought enlivens the deed; it can also be inferred from the deed." L. Sullivan, Antitrust § 39, at 105 (1977).

### E. *Evidentiary Rulings*

AT & T challenges several of the trial court's rulings on the admissibility of evidence, arguing that the exclusion or limited admission of some evidence prevented it from proving that Litton chose to leave or was driven from the terminal equipment market because of adverse publicity resulting from a bribery scandal and other corrupt practices. AT & T also maintains that the trial court judge erred in admitting some evidence that was unduly prejudicial to AT & T while excluding similar evidence favorable to AT & T on the issue of the reasonableness of the PCA requirement.

The cumulative effect of these errors, AT & T argues, requires reversal. We deal with these arguments in the order advanced by AT & T.

#### 1. *Exclusion of the Roberts Notes*

■ In 1973 Litton conducted an internal investigation of possible employee misconduct related to the sale of Litton terminal equipment. A Litton attorney, Norman Roberts, made notes of his interviews with various Litton employees during the course of this investigation. AT & T argues that these notes constitute a "devastating admissio[n]" against Litton insofar as they reveal that Litton employees gave potential customers "calculators, girls and anything else" to make a sale, that "sales morale and performance [were] . . . way down," and that "skimming" and "funny deals" were commonplace. AT & T claims that the notes were admissible under Federal Rule of Evidence 801(d)(2)(D), which excludes from hearsay "admission[s] by [a] party-opponent" in the form of statements made by a party's "agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship."

AT & T's claim that Roberts' notes—which summarized what various Litton employees recounted to him about wrongdoing on the part of other Litton employees—were admissible because the multiple levels of hearsay were all made in the course and scope of employment, is not persuasive. *See Northern Oil Co. v. Socony Mobil Oil Co.,* 347 F.2d 81, 85 (2d Cir.1965). The fact that Roberts summarized what some Litton employees said about other employees in the course of his investigation does not bring the events he summarized within the "scope of his agency or employment" under 801(d)(2)(D). *See* J. Weinstein, 4 Evidence 801–164 (1981) ("Gossip does not become reliable merely because it is heard in an office rather than a home.") The hearsay which he summarized may well have been

---

**44.** *See Northeastern Telephone Co.,* 651 F.2d at 95 n. 28, *citing California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727 (9th Cir.1979) (holding that no synergistic effect arises from individual allegedly anticompetitive practices where proof in numerous critical aspects is utterly lacking).

inadmissible even if testified to by the employees interviewed. *See Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 80 n. 3 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). In any event, AT & T made no attempt at trial to lay the necessary foundation for the admission of the notes under 801(d)(2)(D) or any other rule, and simply argues here that the terms of 801(d)(2)(D) were satisfied. We decline to hold that the trial court committed reversible error by failing to admit the notes, either for their truth or otherwise, particularly in view of the fact that AT & T could have overcome the trial court's objections by examining Roberts himself or those Litton employees he interviewed. *See Litton Systems, Inc. v. AT & T Co.*, 91 F.R.D. 574, 578 (S.D.N.Y.1981). We note that while Judge Kearse disagrees with our hearsay analysis, she agrees that there was no reversible error.

### 2. The San Mateo Bribery Incident

■ In November of 1973 four of Litton's executives in its terminal equipment division were indicted for paying bribes to an employee of the state college system in San Mateo, California. The trial court permitted AT & T to prove that the officials were indicted and subsequently discharged, but excluded evidence of the bribery under Federal Rule of Evidence 403 because of its emotional and prejudicial content. We note that the trial court at one point indicated that it would consider admitting the bribery evidence if AT & T would allow Litton to offer proof that AT & T had bribed public officials; AT & T declined the offer. Plainly the trial court did not abuse its discretion in excluding this evidence.

### 3. The Mellor Memorandum

■ AT & T argues that the trial court erred in not admitting for its truth a memorandum taken by James Mellor, a Litton senior vice-president, that summarized Mellor's conversation with Leonard Mende, one of the Litton BTS (Business Telephone Systems) executives who had been discharged as a result of the San Mateo incident. Mellor's notes of this conversation indicate that he told the discharged executive that the San Mateo scandal had "screwed up a very promising business activity." The trial court admitted the memorandum for the purpose of showing what Mellor had said to Mende, but refused to admit the memorandum for its truth—i.e., as proof that the San Mateo scandal caused Litton to leave the terminal equipment market. AT & T makes the same argument under 801(d)(2)(D) with respect to this evidence that it makes with respect to the Roberts notes, and the reservations we expressed earlier are applicable here. In any event, Mellor himself testified that the contents of the memorandum accurately summarized what he said, and the memorandum was examined by the jury and quoted in AT & T's opening and closing arguments. We therefore cannot see how AT & T was prejudiced by the trial court's decision not to admit the memorandum for its truth.

### 4. The Selph Deposition

■ The trial court granted AT & T special leave to take the deposition of a Litton employee who had been discharged in connection with the San Mateo incident. In granting AT & T's request to take this deposition, the trial court limited discovery to those matters made relevant as a result of Litton's eleventh-hour disclosure of the Roberts notes. AT & T argues that some of Selph's deposition testimony that the PCA device had no effect on Litton's sales should have been admitted, particularly in view of the fact that the trial court allowed Litton to introduce deposition testimony outside the scope of a similar special leave. We attribute this difference in treatment to a difference in the content of the testimony. In granting special leave to take the Selph deposition the trial court imposed certain limitations that AT & T ignored; the discretion involved in reopening discovery could be cast aside if parties could ignore such limitations with impunity. In any event, the cumulative nature of the evidence excluded belies any claim that AT & T was prejudiced.

### 5. Admission of Hoxie's Testimony

■ AT & T contrasts the trial court's exclusion or limited admission of all of the

above evidence with the admission of testimony by Lowell Hoxie, a former Litton vice president in charge of the terminal equipment division's marketing and administration group. Hoxie testified that problems associated with defective PCAs, short supply, and missed delivery dates imposed "incredible cost[s]" on Litton, the effects of which were "devastating" to Litton's efforts to establish itself in the terminal equipment market. The trial court rejected the argument that this testimony was inadmissible as hearsay because, although Hoxie testified in part from recollection of oral reports made by subordinates, much of his testimony was based on first hand knowledge and observation or reports made in the ordinary course of business. The testimony was therefore admitted under Federal Rule of Evidence 803(24), which provides for the admission of hearsay statements not specifically enumerated in Rule 803. The trial court found that the testimony had sufficient "circumstantial guarantees of trustworthiness," Fed.R.Evid. 803(24), to justify its admission because the reports, even if oral, were made in the ordinary course of business. The court also explained that it was doing so to avoid the "expensive and very inefficient" alternative of "call[ing] enough witnesses to furnish non-hearsay substantiation of [the] summary" offered by Hoxie. Thus, although the trustworthiness of recollections of the sort Hoxie's testimony contained is open to question, *see Bowman v. Kaufman*, 387 F.2d 582, 586–87 (2d Cir.1967), the potential hearsay taint of Hoxie's testimony is not sufficient to justify reversal.

6. *Evidence Relating to the Reasonableness of the Interface Tariffs and AT & T's Opposition to Certification*

■ AT & T objects to the trial court's treatment of three other items of evidence, all of which were offered by either AT & T or Litton as bearing on the reasonableness of the interface tariffs or AT & T's opposition to certification standards. The first ruling to which AT & T takes exception is the admission of various FCC decisions that described AT & T's tariffs as "unreasonable," "illegal," "discriminatory," or "unlawful." Although the trial court excised the words "unlawful" and "illegal" at AT & T's request, it refused to remove portions stating, for example, that the interface tariff was "unnecessarily restrictive" and an "unjust and unreasonable discrimination." According to AT & T, the different meanings of "reasonableness" under the Sherman Act and the Communications Act justified its request to have these words removed and the jury was unavoidably prejudiced by the trial court's failure to do so.

We agree with Litton that these decisions were central both to Litton's claim that the PCA device was unnecessary and Litton's rebuttal of AT & T's defense that the interface tariff was an attempt to comply with previous FCC rulings. The order excluding all portions of the FCC rulings stating that the tariffs were "unlawful" or "illegal" gave AT & T all to which it was entitled because the FCC continually held after *Hush-A-Phone* that AT & T's practices were not necessary to protect the telephone system. The findings thus directly undercut the predicate of AT & T's argument that the PCA requirement was "reasonable" under the antitrust laws because it was an attempt to follow regulatory policy. The findings were properly admitted under Federal Rule of Evidence 803(8)(C) as factual findings resulting from an investigation made pursuant to authority granted by law.[45] Moreover, the court's charge made it clear to the jury that the term "reasonable" as used in the rulings did not necessarily

---

**45.** AT & T cites to our decision in *City of New York v. Pullman Inc.*, 662 F.2d 910 (2d Cir. 1981) as support for the proposition that a finding made by a government agency for one purpose should be excluded from other proceedings considering the same or similar facts because of the undue weight a jury might accord such findings. In *City of New York*, however, we affirmed the trial court's exclusion of an interim staff report of a government agency because the report was "[b]y its own terms, . . . not the final report or finding of a government agency within the meaning of [Fed.R. Evid. 803(8)(C)]." *Id.* at 914. In the alterna-

signify the same thing as "reasonableness" under the antitrust laws and were therefore not binding.

AT & T's second objection contrasts the admission of the above FCC decisions with the trial court's exclusion of a 1969 New York State Public Service Commission decision upholding the interface as a reasonable means of protecting the network against harm. The trial court excluded the 1969 decision upon its own motion on the grounds that the monthly charge for the interface considered there was fifty cents, as opposed to the average monthly charge of over six dollars for the interface device challenged in this case. AT & T argues that it was deprived of an opportunity to prove to the jury that AT & T was not alone in its belief that the interface device was absolutely necessary to protect the telephone system from harm. *Cf. Mid-Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 615 F.2d 1372, 1390 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).

We view this evidence as arguably probative of AT & T's position, and find it difficult to justify the exclusion of this decision in light of the admission of the various FCC rulings. Although there is a considerable difference in cost between the two interface devices, this goes more to the weight to be accorded the evidence than its admissibility; any confusion or prejudice probably could have been avoided by appropriate instructions. But we are also mindful of the fact that this was a complicated and extensive trial, involving four and one-half years of pretrial proceedings, five months of trial, more than 18,000 pages of testimony and 945 exhibits. If a jury trial of this size and complexity is to be had at all, the trial court must have the discretion to limit the evidence at some point. We cannot find that this exclusion amounted to prejudicial error.

AT & T's final objection to the trial court's evidentiary rulings involves a 1976 report prepared by a former member of the PBX Advisory Committee. The report indicated, *inter alia,* that AT & T's competitors viewed some of its practices in connection with the PCA requirement and general pricing scheme as anticompetitive. The trial court recognized that the report was hearsay, and therefore refused to admit it for its truth, but admitted the evidence for the limited purpose of showing what was reported to AT & T. But by 1976 Litton had left the terminal equipment market and the PBX Advisory Committee had completed its work. We therefore cannot see how the report bears on the only issue for which it could have been relevant, viz., whether AT & T knew that the Committee felt that AT & T's opposition to certification was in bad faith. Thus the ruling was erroneous, and the possible prejudicial effect—the report stated that AT & T's competitors felt that "Bell pricing has virtually killed the Interconnect market"—is troubling. We view the trial court's ruling as unfortunate, but do not believe that this ruling, or any of the other rulings, denied AT & T a fair trial even when considered collectively. Fed.R.Evid. 103(a); Fed.R. Civ.P. 61. *See, e.g., McKinnon v. Skil Corp.,* 638 F.2d 270, 276 (1st Cir.1981) (ruling, if erroneous, harmless as not affecting "substantial rights").

## F. The Verdict for Litton as Customer

In addition to the injuries it sustained as AT & T's competitor, Litton alleged that it was entitled to recover $491,778.57 spent for the installation and rental of AT & T interfaces on its own internal telephone equipment for the eleven year period running from January 1, 1969 to the end of 1979. The jury awarded Litton exactly six-elevenths of this amount, $268,243, possibly reflected in the jury's initial determination that AT & T opposed certification in bad faith from and after 1973 until the end of 1978. We do not, for reasons stated in our discussion of Litton's claims as a competitor, believe that this verdict should be over-

---

tive, we noted that the trial court judge had not abused his discretion in deciding that admission of the report was inadvisable under Fed.R.

Evid. 403. *Id.* at 915. Here, of course, there is no question that the FCC decisions are within the scope of 803(8)(C).

turned on *Noerr-Pennington* grounds. But AT & T offers us three other reasons—one factual and two legal—to overturn the verdict. We reject each of them in turn.

▮ AT & T's first argument goes to the sufficiency of the evidence supporting the jury's verdict.[46] Specifically, AT & T complains that the evidence was insufficient because Litton failed to itemize its expenses for the charges on an annual basis. AT & T waived this objection by failing to challenge the figures or request that the witness presenting them break them down. Fed.R.Civ.P. 46. Taking another tack, AT & T argues that Litton should have mitigated its damages by removing the interface devices as soon as the tariff requiring them was invalidated.[47] Aside from being inconsistent with its earlier argument that the jury apportioned the damages without evidentiary support, this argument cannot succeed because Litton's failure to remove the devices is readily explicable on the grounds that the expense of removal—some of the devices were permanently wired into the equipment—might have exceeded the savings resulting from removal.

▮ AT & T's second argument against the verdict for Litton as customer relies on the "filed tariff" doctrine announced in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). There the Supreme Court held that a shipper could not recover under the antitrust laws for injuries sustained as a result of allegedly unreasonable rates that had been filed with and approved by the Interstate Commerce Commission. We have recently held, however, that the *Keogh* doctrine is inapplicable to ultimately "disapproved tariffs ... when ... the regulatory agency expressly refuses to commit itself pending investigation." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.1981). In reaching this conclusion we relied, in part, upon our decision in *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d at 83–84, which held that a tariff filing does not immunize a regulated entity from antitrust scrutiny, and in part on the lower court's opinion in this case, *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 487 F.Supp. 942, 951 (S.D.N.Y. 1980). *See City of Groton, supra,* at 931. Unless otherwise advised by higher authority, we do not intend to disavow *City of Groton* or the import of our discussion on the interplay between regulation and antitrust immunity in *Northeastern Telephone Co.*

This case can be distinguished from *Keogh* and decisions holding the filed rate doctrine applicable, *see McLeran v. El Paso Natural Gas Co.*, 357 F.Supp. 329, 331–32 (S.D.Tex.1972), *aff'd without opinion,* 491 F.2d 1405 (5th Cir.1974); *City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763, 769–771 (D.Del.1979), because the issue here is not the reasonableness of the interface tariff rate as compared to some other rate that might have been charged, but instead whether the PCA requirement itself was reasonable, i.e., whether there should have been any charge at all. We thus

---

46. AT & T argues that the jury had no rational basis for apportioning damages as it did because "the vast majority" of PCA charges could have occurred in years the jury thought it had excluded from consideration. Brief at 125 & n. 117. This could be correct but in the absence of a breakdown we or the jury might just as easily have assumed that the vast majority of charges could have occurred in the six years 1973–78 which AT & T says were the years utilized by the jury. In any event in light of the jury's later finding that the PCA tariffs were filed in bad faith the ultimate award seems to err on the low side, if any. We assume that AT & T does not want a retrial limited to this issue.

47. An antitrust plaintiff has a duty to mitigate damages. *See Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 398–99 (2d Cir.1980); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1360 (2d Cir.1976). But if AT & T is correct that the jury's award reflects a six-year period running only from the beginning of 1973 until the end of 1978, when the FCC order setting aside the last protective circuitry requirement became final, the damage award was fair. Moreover, failing to mitigate was an affirmative defense which AT & T omitted either to plead or prove.

believe that the concerns expressed in *Keogh* involving the possible inconsistency between the operation of the antitrust laws and an independent regulatory scheme designed to fix reasonable rates under a statute are not implicated here. We therefore affirm the lower court's holding with respect to the inapplicability of the *Keogh* doctrine.

AT & T's third and final argument goes to Litton's standing to seek damages as a customer. Essentially, AT & T argues that when Litton donned a customer's hat it placed itself outside the "target area" that delineates one plaintiff from another in terms of standing to sue. The "target area" doctrine was first enunciated in *Billy Baxter, Inc. v. Coca Cola Co.*, 431 F.2d 183, 187 (2d Cir.1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), where we stated that

> [A] plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act.... These terms do not provide talismanic guides to decision but they do indicate the need to examine the form of violation alleged and the nature of its effect on a plaintiff's own business activities.

Customers are not *per se* outside the target area. *See, e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 341, 99 S.Ct. 2326, 2332, 60 L.Ed.2d 931 (1979); *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 313–15, 98 S.Ct. 584, 588, 54 L.Ed.2d 563 (1978); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 486 n. 10, 97 S.Ct. 690, 696 n. 10, 50 L.Ed.2d 701 (1977); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948). The test is ultimately one of directness. We have thus looked to whether the conspiracy was "aimed" at a particular entity in the area of the economy threatened by anticompetitive conduct, *see Calderone En-*

*terprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972), and to whether the injury in question was central to the attainment of the anticompetitive objective rather than a mere incident thereto, *see Schwimmer v. Sony Corp.,* 637 F.2d 41, 48–49 (2d Cir.1980).

The Supreme Court has recently rejected an argument similar to the one AT & T makes here in connection with Section 4 of the Clayton Act. In *Blue Shield of Virginia v. McCready,* —— U.S. ——, ——, 102 S.Ct. 2540, 2548, 73 L.Ed.2d 149 (1982) the Court recognized standing of a health insurance subscriber who was denied reimbursement for psychological therapy under a policy term providing reimbursement for such services only if they were rendered by psychotherapists. The petitioners in *McCready* adverted to the "target area" doctrine, citing our decision in *Calderone Enterprises, supra.* In holding that the petitioner's injury was not too remote the Court pointed out that the "target area" test does not "imply that it must have been the purpose of the [defendants] to injure the particular individual claiming damages," —— U.S. at —— n. 15, 102 S.Ct. at 2548 n. 15 (citing *Schwimmer, supra* ).

In this case, as in *McCready,* it avails AT & T little to argue that customers are outside the target area because the anticompetitive effect, if any, of the interface tariff was aimed at terminal equipment manufacturers rather than customers. While an intent to injure a specific entity may well be sufficient to satisfy the target area test, our emphasis in *Schwimmer* on whether the injury was central to the attainment of the anticompetitive objective suggests that this is not always necessary. In this case, the jury found that AT & T imposed the interface tariff in order to maintain its monopoly position in the terminal equipment market. The tariff was "aimed" in the first instance at AT & T's customers in the sense that it applied to every user that chose to interconnect non-AT & T equipment. The tariff was perhaps the only way, and it was

certainly the most efficient way, that AT & T could burden competitors seeking to establish themselves in the terminal equipment market. Thus, the injury to Litton as a customer was not remote even if injury to customers was not AT & T's first objective.

### G. *The Damage Study*

AT & T argues that the damage award for Litton as a competitor must be overturned because it was based on a study that incorporated assumptions that were both unsubstantiated in the record and contrary to some of the jury's findings regarding the legality of certain AT & T practices. Litton's damage study, the so-called "Lost Profits Study," was prepared by Richard Hexter, whose substantial qualifications we set forth in the margin.[48] The two year study used a variety of sources to generate sales, profit, and market share data for Litton's position in the interconnection market from 1972 until 1990.

We note at the outset that the study was conservative in that it assumed that Litton would forego short term profits to achieve larger market shares and profits from 1979 on. The jury awarded Litton estimated profits up to and including 1978, in keeping with the trial court's instruction that Litton had an obligation to reenter the market when the interface tariff was finally set aside in 1978. We also note preliminarily, in order to provide some perspective on the magnitude of the telephone terminal equipment market and the jury's award, that Litton sustained an out of pocket loss of some $53 million before it left the market. Although we do not know AT & T's profits, its revenues from the sale of terminal equipment during this period was at one point in excess of $1.2 billion. By AT & T's own admission, Litton was the "number one formidable adversary" in this market and Hexter testified that if Litton had obtained a market share of even 6.9%, its 1982 profits alone would have been $37 million. Hexter's Lost Profits Study was typical of its genre in that it was based on an estimate of what Litton's experience would have been in the absence of the interface tariff (the "but for" world) as opposed to Litton's actual experience (the "real world").

As the only evidence introduced in support of Litton's damage claim as a competitor, the Hexter study conveniently provides a single target for the two salvos AT & T fires. The first is that the record fails to support certain assumptions upon which the study is based. The second is that the study incorporated assumptions regarding the absence of pricing and other practices that the jury either did not consider or determined not violative of the antitrust laws. We reject AT & T's argument that Litton's damage study was based on unsupported assumptions or practices held lawful by the jury and affirm the jury's award.

#### 1. *Support for the Hexter Study in the Record.*

AT & T argues that Hexter's projections—the heart of the Lost Profits Study—were based on a host of mutually independent assumptions which find no support in the record. The argument is that the Lost Profits Study should therefore not have been admitted and that the verdict must be set aside. *See Yentsch v. Texaco, Inc.,* 630 F.2d 46, 59 n. 19 (2d Cir.1980); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 912–13 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). AT & T specifically attacks six "assumptions" of the Hexter study.

The first of these relates to Hexter's assumption that certification standards would have been adopted by early 1973 "but for" AT & T's opposition. AT & T argues that because various other groups also were op-

---

**48.** Hexter received his MBA from Harvard University and has taught graduate courses in finance and management at Columbia and Yale Universities. Prior to forming his own firm in 1975, Hexter worked for 15 years with Donaldson, Lufkin & Jenrette, an investment banking firm, where he served first as an industry analyst and later as the head of that firm's corporate financing, investment banking and venture capital division. Hexter was also familiar with the telecommunications industry as a result of his service as a board member of Arcata National Corporation and his study of Litton while he was with Donaldson, Lufkin & Jenrette.

posed to certification, there is no evidence that AT & T's conduct was responsible for the FCC's failure to implement a certification program any earlier than it did. But Litton demonstrated that various AT & T executives admitted that they could have filed standards within a year of the *Carterfone* decision. This supports the premise, as not unreasonable or contrary to common sense, *see Auto West, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 566–67 (2d Cir.1970), that if AT & T had behaved legally there would have been no interface device after early 1973.[49] The validity of this premise is the very heart of the jury's verdict that AT & T filed the interface tariff and opposed certification in bad faith.

The second assumption AT & T challenges concerns the amount of money Litton would have invested in research and development in Hexter's "but for" world. As support, AT & T points to the Business Opportunity Plan Litton prepared before it entered the market. The plan called for an investment of $1,452,000 in research and development from 1972 to 1976, but Hexter assumed that Litton would have invested $14,828,000 in the same period. But of course R & D does not immediately bear fruit; by making a higher estimate of Litton's investment than was contemplated in the Business Opportunity Plan the effect was to *decrease* profits for Litton's early years in the terminal equipment market.[50] Because the jury only awarded damages for lost profits in the years from 1972 to 1978, to the extent that Hexter's study might have overestimated R & D investment, Litton rather than AT & T was disadvantaged. In any event, AT & T's reference to the Business Opportunity Plan only substitutes

one set of assumptions for another. In fact, there was evidence in the record from the author of the Business Opportunity Plan that Litton had intended from the beginning to spend more on R & D than the plan projected. There was also testimony to the effect that Litton was ready to invest whatever was needed to make the business succeed. The AT & T argument is thus both irrelevant and mistaken.

■ AT & T's third argument is that Hexter's assumptions about the size of the total terminal equipment market and Litton's share of that market were not supported by the record. But we note that damages in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), thus bringing the elasticity of *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), into play. *See also Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Accordingly, "where there is a basis on which a jury can reasonably infer significant antitrust injury, [the court] should be very hesitant before determining that damages cannot be awarded." *Berkey Photo, Inc.,* 603 F.2d at 304. Hexter's estimates were based upon a two year analysis of industry data available from Litton, AT & T, and public sources, and a review of more than thirty terminal equipment studies. His study projected that by 1978 AT & T would still have 79 percent of the terminal equipment market with the remaining 21 percent shared by all non-AT & T competitors.

**49.** AT & T suggests that because other groups also opposed certification standards, Litton must prove a negative—*i.e.,* that this opposition had nothing to do with Litton's injury—in order to recover. Although Litton was required to prove a "causal connection" between its injury and AT & T's illegal conduct, it was sufficient to demonstrate that AT & T's conduct was a substantial or materially contributing factor. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969);

*Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 702, 82 S.Ct. 1404, 1412, 8 L.Ed.2d 777 (1962).

**50.** Indeed, under the profit scheme in Hexter's model, Litton sustained *losses* in 1972 and 1973. We also note that Litton introduced evidence showing that its early performance in the terminal equipment market exceeded the projections contained in the Business Opportunity Plan and that R & D expenditures were increased accordingly.

This estimate was conservative as compared to a study done by General Electric, which estimated that by as early as 1975 competitors would divide 30 percent of the market. Hexter's estimate of Litton's share of the total non-AT & T terminal market was also conservative; his estimates never exceeded 14.5 percent when in fact Litton's actual share before it left the terminal equipment market was at one point between 23 and 25 percent.

AT & T also complains about Hexter's treatment of Litton's bad debt costs. The argument is that Hexter ignored Litton's actual experience and postulated these costs on the basis of a composite profile based on six well-run, thriving companies in high technology industries. For the limited time Litton sold and leased equipment, its bad debts amounted to almost 12 percent of its sales, while Hexter's model assumed that they would amount to less than 2 percent. According to Hexter's testimony, however, these companies were the six most comparable; three of them were actually in the terminal equipment business. We believe that Hexter's decision to use these estimated bad debt figures was based on the plausible assumption that Litton's actual experience in the start-up phase of its business was not representative of what those costs would be in later years.[51] We note in any event that Hexter's estimates of Litton's profits for the 1972 to 1976 period averaged less than 1 percent of sales, and the estimated profits of only 6.7 percent of sales for 1977 and 1978, was about half of AT & T's profits on its overall sales. We think that AT & T's argument as to Hexter's treatment of this single cost factor goes only to the weight of the evidence and does not compel rejection of the damage study or overturning the verdict. *Greene v. General Foods Corp.,* 517 F.2d 635, 665 (5th Cir. 1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).

The fifth Hexter assumption that AT & T challenges is that there would be "tough but equal" price competition and that Litton and other terminal equipment companies "would be able to compete profitably against whatever Bell tariffs were filed." AT & T argues that it had an inherent pricing advantage and that therefore neither Litton nor any other competitor could compete equally. This court has, of course, emphasized that a monopolist may lawfully take advantage of benefits deriving from its size or integration, *see Berkey Photo, Inc.,* 603 F.2d at 276, but AT & T has completely mischaracterized Hexter's assumption. Hexter's assumption concerning "tough but equal competition between the products and the people in the field" related not only to pricing, but included "price and features." His assumption was that "the companies would compete on their ability to sell, properly install and service the equipment."

The assumption that Litton would have been able to compete successfully was borne out by Litton's initial success in the terminal equipment market and evidence tending to indicate that AT & T itself thought that some of Litton's products possessed desirable features that AT & T's equipment did not. Moreover, Hexter testified at trial that his assumptions as to Litton's ability to meet AT & T's competition in the non-price category of product capabilities were in fact conservative insofar as he assumed only that Litton would stay abreast of the competition after it had established a position in the market.

The sixth and final assumption AT & T challenges is Hexter's inclusion of lost profits attributable to Litton's leasing operation, Litton Industries Credit Corporation (LICC). AT & T argues that the only commodity essential to an equipment leasing business is money and that Litton's leasing

---

**51.** That AT & T's objections go to the weight and not the validity of the evidence used in the study seems plain. From the more than one hundred cost, expense, and other factors Hexter used in his study, AT & T attacks one figure—bad debts as a percentage of sales—to challenge Hexter's treatment of costs. AT & T's argument that Hexter's model should have somehow reflected the fact that 80 per cent of all new businesses are unsuccessful is frivolous.

subsidiary was therefore free to lease any other equipment—telephone terminal equipment or otherwise—that it could purchase. But in the real world—for the limited time that Litton was in it—Litton did lease as well as sell its equipment and the money that LICC used to purchase the equipment from Litton BTS was obtained by financing. Litton introduced evidence to support the proposition that the leasing operation was essential to its market efforts because many customers preferred a leasing arrangement to outright purchase. AT & T's argument that Litton could have leased any other commodity puts the cart before the horse; Litton operated the leasing subsidiary to sell telephone equipment, and not *vice versa.* AT & T's contention that Litton should have leased another product is equivalent to saying that an antitrust plaintiff's recovery of lost profits is limited by the highest alternative return that a plaintiff could have secured in another line of business entirely. The leasing operation was part of Litton's terminal equipment business and whatever profits Litton's leasing operation lost as a result of AT & T's conduct are therefore properly included in the measure of damages.

In short, the Hexter study is supported by the record and not based on assumptions as to evidence not in the record. The Hexter study is not rendered inadmissible because AT & T would have calculated the damages in a different manner or used other figures. *See, e.g., Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 843 (7th Cir.1978); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1207 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). Under *Story Parchment, Bigelow v. RKO Radio Pictures,* and *Zenith Radio Corp.,* the verdict must be sustained. *Cf. Shapiro, Bernstein & Co. v. Remington Records, Inc.,* 265 F.2d 263, 272 (2d Cir.1959).

2. *Litton's Damage Study and AT & T Conduct Found Lawful: Causation.*

■■■ AT & T argues that the Hexter Lost Profits Study assumed the absence of AT & T practices that the jury either did not consider or did not find unlawful, e.g., pricing practices, disparaging advertising, and copying competitors' products. The argument, stated more simply, is that Hexter could not separate the lost profits related to lawful activity from the lost profits related to the unlawful interface and practices associated therewith. AT & T correctly points out that courts have held that damage studies are inadequate when only some of the conduct complained of is found to be wrongful and the damage study cannot be disaggregated. *E.g., Mo̊mand v. Universal Film Exchanges, Inc.,* 172 F.2d 37 (1st Cir. 1948), *cert. denied,* 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949); *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F.Supp. 423, 434, 436 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.,* 636 F.2d 1188 (9th Cir.1980) (per curiam), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

But the record does not sustain the AT & T position. What Hexter assumed was that "to the extent that there were any marketing practices either related directly or indirectly to the interface device that may have been harassing or uncooperative," that these practices would not be present in the " 'but for' world." He made an effort to segregate how much in lost profits related to the interface and to pricing or marketing practices, but rejected it because he did not believe that the results were fruitful. He assumed that Bell would know its own costs and would price toughly but competitively and that companies challenging Bell would, everything else being equal, be able to compete and make a profit. He did not assume that any particular AT & T pricing practices would be eliminated. In short, there is no evidence that Hexter assumed AT & T's prices were illegal or that he made specific assumptions about how individual AT & T pricing practices would have changed. AT & T did not submit contrary evidence. How else lost profits can be proved in an antitrust case, we are not told. In short, there was an evidentiary basis for the jury

award which—all things considered—was modest in light of the fact that Litton's lost profits were limited to years prior to 1978. *See generally Lavender v. Kurn,* 327 U.S. 645, 652–53, 66 S.Ct. 740, 743, 90 L.Ed. 916 (1946), *Eastman Kodak Co. v. Southern Photo Material Co., supra,* at 378–79, 47 S.Ct. at 405.

## H. *Sanctions on Litton for Failure to Provide Discovery*

The trial court upheld the magistrate's finding [52] that Litton's attorneys had engaged in a "pattern of intentional concealment of evidence" relating to the finder's fee investigation in connection with Litton's San Mateo office; the evidence specifically consisted of certain notes that were in the bottom of the drawer of in-house counsel Roberts until the late summer of 1979. *See Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 90 F.R.D. 410 (S.D.N.Y.1981). The court concluded that the Roberts notes were material to preparation for AT & T's defense that Litton BTS went out of business as a result of mismanagement, incompetency and dishonesty, rather than as a result of AT & T's antitrust violations. It found other Litton in-house counsel grossly negligent for stating in connection with the taking of Roberts' deposition that there were no other relevant documents, without having reviewed all of Roberts' files; in representing in an April 24, 1978 brief that the Bruder investigation (after the then new President of Litton BTS, Robert Bruder) in 1973 was directed only at the San Mateo matter when in fact San Mateo was only one of seven instances of suspected misconduct

Bruder wanted investigated; in representing in the same brief that all of Roberts' interview notes had been turned over to the San Mateo County District Attorney when in fact the notes of Roberts' interviews with five Litton BTS employees had not been turned over; in representing in another brief filed December 6, 1978 that Litton had produced all "notes and memorandums of interviews of persons not connected with the San Mateo matter;" in failing to turn over to AT & T Roberts' notes following the court's opinion and order of March 26, 1979, which specifically rejected the argument that work product immunity attached to the interview reports; in representing in a letter of July 6, 1979 that Roberts had taken no notes of his interview with Litton BTS employee Hoxie when in fact Hoxie had testified that he had been interviewed. The court also found "willful misconduct" on the part of Litton's general counsel in this litigation; after receipt of the complete set of Roberts' interview notes in the late summer of 1979, counsel failed to apprise the magistrate, the district court and the defendants of the existence of the additional notes to correct the earlier erroneous assertions that had been made. Even after production of handwritten copies of Roberts' notes of interviews with certain Litton BTS employees, the entire notes were not produced and it was claimed that the notes withheld involved matters "wholly extraneous" to the case, when in fact they also involved notes on the use of fake finders, finders' fees and other matters. But the court refused Bell's requested sanction of dismissal and instead denied Litton recovery of all costs and attorneys' fees to which

---

**52.** Litton argues that Magistrate Sinclair should have been disqualified from presiding over pretrial discovery because some four to seven years prior to this litigation he worked as an associate on a case that eventually resulted in Litton threatening to sue his law firm for malpractice. Our review of the record leads us to agree with Judge Conner that it "is not reasonably conceivable" that Sinclair was likely to be prejudiced against Litton as a result of this earlier involvement. Litton also argues that it was error to assign Magistrate Sinclair the task of conducting an evidentiary hearing on discovery order violations. While we may

agree that it would have been better practice to assign this task to another magistrate, Magistrate Sinclair was clearly in the best position to review compliance with the 122 discovery orders issued in this case. The district court reserved to itself the question of what sanctions would be imposed for any discovery violations; Sinclair's review of the record did not exceed the scope of authority granted to magistrates under 28 U.S.C. § 636(e)(5) (Supp. IV 1980) (magistrate may certify to the district court facts relating to "act or conduct which if committed before a judge ... would constitute contempt").

it would otherwise be entitled as a matter of law, including those under Section 4 of the Clayton Act, 15 U.S.C. § 15. *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 91 F.R.D. 574 (S.D.N.Y.1981).

Needless to say, the parties disagree entirely on the sanctions imposed. AT & T would have the action dismissed and Litton disentitled to recover one dime, a sanction which is within the court's discretion to impose. *See National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam); *Penthouse International, Ltd. v. Playboy Enterprises Inc.,* 663 F.2d 371, 386–92 (2d Cir.1981); *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062 (2d Cir.1979). Litton argues that a penalty of over $10 million is excessive, especially where counsel supervised the disclosure of three and one half million documents in a professional manner and where the notes were ultimately turned over without any prejudice to AT & T by virtue of their late production because the notes (a) were inadmissible hearsay, (b) contained no specific information, and (c) were unimportant because the whole subject of finders' fees was mentioned only once in the course of an. entire five hour summation by AT & T counsel before the jury. Litton also argues that under *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), decided since the district court's sanctions orders were made, the miscellaneous notes were, in fact, privileged and should never have been turned over to AT & T at all, as Litton had consistently urged the magistrate and district court with the agreement of the magistrate in the first instance.[53]

We affirm the district court in this regard. The payment of attorneys' fees is a part of the penalty for violating the anti-

trust laws. *Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 859–60 (7th Cir.1981); *Farmington Dowell Products Co. v. Forster Manufacturing Co.,* 421 F.2d 61, 90 (1st Cir.1969). At the same time there is no doubt that attorneys as officers of the court must operate on an honor system, *Litton Systems, Inc. v. AT & T Co.,* 90 F.R.D. at 417 (S.D.N.Y.1981), and must be appropriately disciplined to provide both specific and general deterrence. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 763–64, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980); *National Hockey League v. Metropolitan Hockey Club, Inc., supra,* at 643, 96 S.Ct. at 2781. Federal Rule of Civil Procedure 37(b) expressly empowers the court to impose a wide range of specified sanctions for failure to obey court orders. *See Roadway Express, Inc., supra,* at 763–64, 100 S.Ct. at 2462; *Stanziale v. First National City Bank,* 74 F.R.D. 557 (S.D.N.Y.1977). Given the court's express findings of bad faith, it could also have imposed sanctions on Litton as an exercise of its inherent powers. *See Roadway Express, Inc., supra,* at 764–67, 100 S.Ct. at 2463. It is immaterial that the notes themselves were ultimately ruled inadmissible on the ground that they were hearsay since they were "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Thus where there is repeated defiance of express court orders dismissal may be an appropriate remedy. *National Hockey League, supra,* 427 U.S. at 640, 96 S.Ct. at 2779 (refusal for 17 months to answer "crucial" interrogatories); *Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 666 (2d Cir.1980) (doing "absolutely nothing at all" to comply with discovery orders or move the case to trial); *Cine Forty-Second Street, supra* (refusal for three years, without moving for protective order, to comply with specific orders to answer interrogatories on damages).

---

**53.** Litton contends that the Roberts notes should have been protected as attorney work product under *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (when house counsel and general counsel interviewed middle-echelon corporate employees regarding possible foreign government bribes, notes of the interviews held privileged as made between attorney and client). But as Litton

concedes, Litton Brief at 121, the internal investigation focused on the employees' own possible misconduct; they were not speaking on behalf of the corporation or in furtherance of its business. The "remote possibility" of criminal litigation involving Litton itself was not sufficient to create a work-product immunity, *Garfinkle v. Arcata Nat'l Corp.,* 64 F.R.D. 688, 690 (S.D.N.Y.1974).

At the same time, because dismissal denies the party access to justice, if the party has a valid claim, dismissal would, in the case of attorney misconduct such as gross negligence, amount to a windfall to an adversary to be resorted to only when necessary to preserve the integrity of the judicial system, or in similar "extreme circumstances." *Interconex, Inc. v. Federal Maritime Commission,* 572 F.2d 27, 30 (2d Cir.1978); *Israel Aircraft Industries, Ltd. v. Standard Precision,* 559 F.2d 203, 208 (2d Cir.1977); *Independent Productions Corp. v. Loew's Inc.,* 283 F.2d 730, 733 (2d Cir.1960). *See also Cine Forty-Second Street,* 602 F.2d at 1064 (dismissal should "be deployed only in rare situations"). Thus the trial court in imposing sanctions expressed its agreement with the concurring opinion in *Cine Forty-Second Street* that it is difficult to "visit upon the client the sins of counsel, absent client's knowledge, condonation, compliance, or causation." *Id.* at 1069.

We believe that the trial court, thoroughly familiar with the record, the parties, as well as the efforts, conduct and omissions of counsel, quite correctly struck a wise balance between the conflicting interests in imposing antitrust penalties under the Clayton Act on the one hand and preserving the integrity of the discovery process on the other. Dismissal of the case would be inappropriate in the light of the limited ultimate role that the Roberts notes played. The imposition of the sanction of no award of attorneys' fees and costs is expensive for Litton, to be sure, but the failures and obstructions of house counsel Roberts, house counsel's conduct at the taking of Roberts' deposition, and the conduct of general counsel, found by the district court in its familiarity with the record and these parties to constitute gross negligence and willful misconduct, led to the sanction. Thus while the damages and hence statutory attorneys' fees in this case are so substantial that in effect Litton (or perhaps to some extent counsel) is being penalized in a sum that on its face is larger than 99 percent of the judgments awarded in any court, it is still only a small fraction of the ultimate recovery here involved. Indeed,

where the stakes are as high as they are in this case, the penalties for obstruction of the truth must be impressive if they are to be effective, yet they must not be so drastic or unfair as the penalty of dismissal. Indeed, in such a case, dismissal is so unlikely to be imposed that, absent steep penalties, Rule 37 would be at most a "paper tiger." Rosenberg, *New Philosophy of Sanctions,* in New Federal Civil Discovery Rules Sourcebook 140, 141 (W. Treadwell ed. 1972). We believe that the trial court acted soundly and correctly, as well as wisely, in imposing the sanction. We decline to set it aside on behalf of either party.

In view of our disposition of the case we need not reach the issues on Litton's cross appeal.

Judgment affirmed.